Filed 3/10/22  In re J.S.C. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.S.C. et al., Persons Coming Under the Juvenile Court Law. | B314026 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.C.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. Nos. DK08500A, DK08500B, DK08500C |

APPEAL from orders of the Superior Court of Los Angeles County.  Stephen C. Marpet, Judge Pro Tempore of the Juvenile Court.  Affirmed.

Karen B. Stalter, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Jacklyn K. Louie, Principal Deputy County Counsel, for Plaintiff and Respondent.

---

Mother appeals from the juvenile court's orders terminating her parental rights to her children J.S.C., K.S.C., and N.C. on the sole ground substantial evidence does not support the juvenile court's finding that the children were adoptable. We affirm.

## BACKGROUND

As the parties' briefs fully set forth the factual and procedural background leading to the court's termination of parents' parental rights, our summary focuses on the facts relevant to the juvenile court's adoptability finding.

### 1. *Current and past dependency petitions*

Mother and father are the parents of J.S.C. (born April 2010), K.S.C. (born September 2012), and N.C. (born December 2014). Father is not a party to this appeal. The current dependency petition arose when the Los Angeles County Department of Children and Family Services (the Department) filed a Welfare and Institutions Code[1] section 300 petition on May 15, 2017, on behalf of the three children. The juvenile court sustained the petition—based on mother's physical abuse of J.S.C. and father's failure to protect, father's physical abuse of J.S.C., and parents' violent altercations in their children's presence—and removed the children from both parents' care.

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

J.S.C. and K.S.C. had been declared dependents of the juvenile court two years earlier, in January 2015, based on mother's inability to care for them appropriately due to her mild intellectual disability, her refusal of services to help her care for them, and J.S.C. having sustained burns while mother was cooking in September 2014, as well as father's failure to protect. The boys, ages four and two at the time, remained in their parents' care with their sister N.C.—born after the petition was filed—and received family maintenance services. The court also ordered the Department to refer the two boys for speech assessments.

After assessments by the Regional Center, N.C. was eligible for Early Start services with in-home services once a week. K.S.C. was found eligible for services based on cognitive developmental delays—he was to receive intervention services three times a week. J.S.C. and K.S.C. also were to receive mental health services.

The juvenile court terminated its jurisdiction in July 2015.

In May 2017, during the initial investigation of the current petition, the Department social worker observed J.S.C. and K.S.C., now ages seven and four, to have speech delays. N.C., who was two years old at the time, was mostly pre-verbal. J.S.C. told the social worker that mother hit him on his face and head, and father hit him on his buttocks, when he didn't listen. K.S.C. said " 'hit,' " pointing to his face and arms and answered " 'Mommy' " when asked who hit him.

The dependency investigator interviewed the children in June 2017 about the petition's allegations. J.S.C. said mother had thrown a cell phone at him that hit him in the face, and she had hit him and K.S.C. on the ear with her hand. The

investigator observed "various scars" on J.S.C.'s lower back and asked J.S.C. how he got them. J.S.C. said his mother had hit him with a belt. J.S.C. vacillated on whether father had hit him with a belt. (Father denied having hit the children with a belt; he said he spanked them on the buttocks with an open hand.) The investigator noted K.S.C. appeared to have a speech impediment and was unable to speak in complete sentences.

On August 11, 2017, the juvenile court sustained the petition, declared the children a sibling group, and detained them from parents, ordering the Department to make best efforts to place the children together.[2] At the September 2017 disposition hearing, the court declared the children dependents of the juvenile court, removed them from parents' custody, and ordered monitored visitation for parents. The court ordered the Department to provide family reunification services and to assist in meeting the children's needs, including with counseling and by following up on speech therapy and Regional Center assessments. In December 2017, the court made further orders for the Department to ensure the Regional Center was providing services for the children.

## 2. *First foster placement*

As of the Department's February 21, 2018 six-month status review report, the children were placed in the foster family home of the Vs. At the beginning of the placement, Mrs. V. had difficulty enrolling K.S.C. and N.C. in school, so she worked with them at home.

---

[2] The court had detained the children from mother, and released them to father, in May 2017.

J.S.C. and K.S.C. had Individualized Education Plans (IEPs) through the school district they had attended while living with parents, but those were not transferrable to their new school district. J.S.C. completed an IEP in the new school district (first grade) in November 2017. It reflected he had a speech or language impairment and low incidence disability. J.S.C. qualified for specialized academic instruction as well as language and speech services. Mrs. V. said J.S.C. struggled in school due to his difficulties with reading and pronunciation.

K.S.C. started school (pre-K) on December 26, 2017. N.C. started a Head Start preschool program on January 18, 2018, after she was potty trained. Mrs. V. said both children enjoyed and were eager to go to school.

Mrs. V. described J.S.C. as "mischievous." He would blame one of his siblings for something he had done, but later confess. J.S.C. would sometimes stare into space as if in his own world. She described K.S.C. as "easy going" and able to understand more and pay attention better than his brother. Mrs. V. said N.C. would easily anger if she didn't get her way by throwing things on the floor.

The children were assessed for mental health services in October 2017. J.S.C. and K.S.C. began weekly therapy in November 2017. Their new therapist, who had seen them three times since January 2018, said the boys had internalized their trauma, as they did not seem to have many behavioral problems. They appeared to be hyper-vigilant at the start of their treatment, were cooperative, and were able to be redirected. She anticipated the children would meet their treatment goals soon.

All three children also had been clients of the Regional Center when living with parents. The three children were pending evaluations by the Regional Center in the foster home's area.

Mrs. V. monitored the children's Sunday afternoon visits with parents. She noticed mother paid attention to K.S.C. and N.C. but ignored J.S.C., and during mother's calls with the children, she responded to the younger children, but not J.S.C.

The Department updated the court on the children's well-being for a July 24, 2018 progress hearing. They continued to do well in the V.s' home. J.S.C. was in summer school and had a tutor. J.S.C. and K.S.C. had both achieved their treatment goals and were discharged from their mental health services on April 4, 2018.

In its October 10, 2018 status review report for the 12-month review hearing, the Department described the children as having made "significant progress" since being placed with the V.s. The V.s had noticed a negative change in the children's behavior, however, when mother visited inconsistently. K.S.C. was most affected by mother's "sporadic and infrequent visits and calls." His tantrums had increased during homework time. N.C. was imitating her brothers' behaviors.

Mental health services were again requested, and in September 2018, J.S.C. resumed services with a new provider. His siblings were in the process of having mental health assessments with the same provider.

In November 2018, the court set a hearing for parents to contest the Department's recommendation to terminate reunification services. The court ordered wraparound services

for J.S.C. and ordered the Department "to address the best permanent plan for the children."

In January 2019, the Department provided the court with adoption assessments for the children dated December 28, 2018. The children were determined "likely to be adopted." The V.s, however, were not interested in providing permanency for the children, as "they are older and cannot guarantee quality care for the children until the age of 18 years old."

The assessor described J.S.C. as "physically healthy" and able to "play[ ] independently"; having a "short attention span," noting the caregiver reported he had difficulty understanding some tasks; "learning disabled," noting he had an IEP and was receiving school-based speech services; and participating in therapy.

K.S.C. also was described as "physically healthy" and able to "play[ ] independently," as well as "enjoy[ing] school." He too had a speech delay and an IEP, and was receiving school-based speech services, as well as therapy.

The assessment for N.C. noted she was "physically healthy," "appear[ed] developmentally age appropriate," "personable," "play[ed] independently," "relat[ed] well to caregivers," and "enjoy[ed] school." She too was in therapy.

The juvenile court terminated family reunification services and scheduled a section 366.26 hearing for May 2019.

### 3.    *Second foster placement*

In its section 366.26 report, filed April 23, 2019, the Department noted the children had been living in the G.s' foster home since March 2019. Mrs. V. had asked the children to be removed, stating J.S.C.'s behavior was " 'worsening.' " He was spitting at her, destroying property, did not follow the house

7

rules, and did not listen. Mrs. V. was a good friend of Mrs. G. and continued to have contact with the children.

The social worker had not observed any concerning behavior during this reporting period. The children appeared to be "stable and adjusting" to their new home. Mrs. G. stated the children behaved "like 'any kid' their age," and she had no concerns. None of the children were clients of the Regional Center.

The report noted J.S.C., who was in the second grade, had received "1"s—meaning little to no mastery—in all subjects on his latest report card. The foster family social worker was helping the caregiver request an IEP for him. J.S.C. was attending therapy, but sometimes did not want to talk during his sessions. The therapist was working with him on building their rapport, discussing his trauma, and learning healthy coping skills and emotional regulation. J.S.C. was able to verbalize what upset him and what made him happy and to share his toys and play with his brother and foster sibling.

K.S.C. and N.C. were developing on target and did not have IEPs. A report from K.S.C.'s school stated he "pays attention, demonstrates independence, completes his assignments[,] and is able to use his fine motor skills." At school, N.C. could follow directions and had learned her alphabet and shapes. Both children missed and wanted to return to Mrs. V.

The Department believed the best permanent plan for the children was adoption. It was continuing its efforts to locate an appropriate adoptive home.

In a status report filed April 23, 2019, the social worker noted the children had warmed up to and were interacting with her more. J.S.C. especially had been reticent to talk during the

social worker's earlier visits. The children were able to play and share with the social worker, ask her questions, and express their needs to both the social worker and caregiver. J.S.C.'s therapist reported J.S.C. had " 'opened' up" and was engaged in therapy. His behavior had improved since living with the G.s.

The section 366.26 and permanency planning review hearings were continued. On September 4, 2019, the court deemed the three children were a sibling group. It ordered the Department to ensure the boys were in speech therapy and to continue to make best efforts to find the children an appropriate adoptive placement.

In the Department's next report, it noted the children were having behavioral issues after having stayed with Mrs. V. while the G.s went on a summer vacation. Mrs. G. asked for mental health services. J.S.C. continued to see his therapist. Mrs. G., as had Mrs. V., informed the Department that mother visited the children inconsistently, sometimes going months without contact. Mother's missed visits and calls saddened the children.

At the October 3, 2019 review hearing, the court ordered the Department to connect the children with appropriate therapeutic services and to continue to make best efforts to find an appropriate adoptive home for them as a sibling group.

In its December 2019 update, the Department confirmed K.S.C. and N.C had started mental health services (on October 20, 2019). Although Mrs. G. was not interested in adoption, the children remained placed with the G.s until the Department could find an appropriate adoptive family. The G.s wanted to continue working with the children until an adoptive home became available. Adoption remained the children's permanent plan.

9

The Department attached the August 2019 quarterly reports for the children's needs and services plans. According to the reports, Mrs. G. said J.S.C.'s behavior had "significantly improved." He was behaving better toward his siblings and able to find other outlets to release his frustrations.

The report also noted J.S.C. had completed second grade successfully and attended summer school. Although J.S.C. had improved, the report recommended he be assessed for a learning disability or impairment due to emotional trauma and to have a psychoeducational assessment outside of the school setting because he still was below grade level.

J.S.C.'s individual goal for the next reporting period was to reduce his aggressive behavior with his siblings from three times a week to once a week. He already had achieved his earlier goals of expressing his feelings at least two to three times a week (as of May 2018), and completing his homework assignments five times a week, instead of twice a week (as of May 2019).

K.S.C. was reported as doing well in the G.s' home. K.S.C. continued to have minor arguments with his siblings and had a hard time sharing his toys. He sometimes, though less frequently, argued with Mrs. G.'s six-year-old daughter and called her names when he was upset. He was able to be redirected and calm himself, however. Mrs. G. described him as "a very caring and forgiving boy."

K.S.C. was attending elementary school and attended a summer program. He was able to write his name, identify letters and shapes, count to 100 by ones, twos, fives, and tens, and knew his kindergarten sight words. He no longer had tantrums.

N.C., on the other hand, was having a difficult time adjusting to the G.s' home and rules. She was defiant and often

would not want to follow the G.s' directives. She also argued with her brothers and the G.s' six-year-old daughter and had trouble sharing. Before moving to the G.s' home, however, N.C. had achieved her goal of decreasing her outbursts from five times a week to two times a week. N.C. was attention-seeking, as well. Recently, she had begun to urinate on herself, the bathroom floor, or the toilet seat, upsetting the other children. The report stated N.C.'s goal for the next reporting period was to reduce this attention-seeking behavior from three times a day to once a day.

N.C. also had a difficult time getting along with her classmates at school. Her teacher said she had a hard time transitioning from one task to another one and often had to be separated from the rest of the class. N.C. was developmentally on target, however. She was learning to use scissors, could write her name, and could name colors and shapes.

In its January 13, 2020 last minute information for the court report, the Department advised the court the children had been matched with a potential adoptive family. The court therefore continued the section 366.26 hearing to May 11, 2020.

In the meantime, the Department filed a status review report on January 23, 2020, to update the court. The children remained in the G.s' care. Mrs. G. was taking all three children to weekly counseling sessions.[3] The Department attached their therapists' progress letters.

---

[3] The children received therapy from the same provider but saw different therapists.

11

As of December 2019, J.S.C. had been engaged and actively participating in his weekly sessions.[4]  He was working on "decreasing physical aggression and increasing his verbal communication."  According to the therapist, J.S.C. "has shown tremendous growth and progress throughout treatment as his behavior at home and school has reportedly improved."

According to his therapist's January 2020 letter, K.S.C., who did not begin weekly therapy until October 2019, had not yet had the opportunity to make more than limited progress.  His therapeutic goals were to decrease his crying spells and to increase positive interactions with his siblings.

N.C. started her weekly therapy sessions in August 2019.  By January 2020, she was actively participating in her sessions but had not made substantial progress in decreasing her tantrums or in saying unkind things to her brothers.

In February 2020, the Department informed the court that the children and prospective adoptive parents the N.s had had four visits that had gone "very well."  The family was looking forward to extended and overnight visits.

## 4.    *Placement with prospective adoptive parents*

On February 27, 2020, the children were placed with the N.s.  According to the Department's section 366.26 report, filed April 20, 2020, the children were struggling with adjusting to the structure, rules, and expectations in their new home with the N.s:  J.S.C. lacked motivation to follow school rules; K.S.C. spoke in a high tone to others; and N.C. was defiant when being redirected.  The children also were not getting along with and

---

[4]    J.S.C. began weekly therapy through this provider in August 2018.

acted aggressively toward each other. The Department referred the children for mental health services through the adoption promotion support services (APSS) program.[5]

The N.s had enrolled the children in a private school when the children moved into their home. On March 2, 2020, J.S.C. started third grade, K.S.C. started second grade, and N.C. started kindergarten, at the new school. Two weeks later, the school closed due to the COVID-19 pandemic emergency. The children began receiving online instruction, and the N.s hired a tutor for the children. (The later-filed May 2020 needs and services quarterly report noted that, with the tutoring, J.S.C seemed to engage better in school and to complete his homework, with which he had been having difficulty.)

The children continued to have visits with parents, now monitored by the N.s. During the COVID-19 pandemic emergency, the visits took place through FaceTime.

The Department asked the court to continue the matter for six months to allow the children and the family time to adjust and to reduce parents' visitation. Adoption remained the children's permanent plan. The matter was continued to August 2020 due to the COVID-19 state of emergency.

On July 20, 2020, the Department filed a status review report describing the efforts it had made, since May 2020, to address the children's needs. The Department noted J.S.C.

---

[5] Due to their move to the N.s' home, J.S.C. and N.C. had been discharged from their therapy provider on February 28, 2020. The therapist noted J.S.C. had made "tremendous progress" on his goal of increasing healthy communication and had met his goal of decreasing physical aggression "months ago." N.C.'s behaviors continued, however.

and K.S.C. had IEPs for speech services but were not receiving them both due to their enrollment in a private, rather than public, school, and the school's closure due to the pandemic. Plans were made to contact the school district to address the boys' needs under their IEPs.

On April 7, 2020, N.C. started mental health services through the foster family agency, Five Acres. She saw a therapist and received weekly home services. J.S.C. started seeing the same therapist on May 5, 2020. K.S.C. was doing well in school and did not exhibit behavioral issues necessitating mental health services. He was referred to therapy nonetheless.

The May 27, 2020 needs and services plan quarterly update noted N.C. was hitting her brothers. The N.s had reported the siblings fought with each other almost daily. To improve their behavior, the children were to work on limiting the number of times they reacted to their siblings' behavior from five times to two times per week.

On June 26, 2020, the children's therapist spoke to the social worker and explained she was providing parent child interactive therapy (PCIT) for N.C. and the N.s because the N.s were "struggling to 'understand'" the children's trauma and to "'manage'" their behaviors. The N.s had asked for a psychiatric evaluation but there were no new referrals due to the pandemic.

At a July 2020 team meeting, the Department, the Five Acres service providers, and the N.s discussed J.S.C.'s and N.C.'s need for intensive services to address their behaviors. The children's current therapist was unable to meet the family's

needs due to her high caseload.  J.S.C. and N.C. would be transitioned from APSS mental health services to ISFC services.[6]

The N.s were "overwhelmed," but said they were committed to following through with the adoption.  They were willing to work with the children using the ISFC program and services. The children, in turn, said they liked living with the N.s. N.C. called them " 'mom' and 'dad.' "

The Department again asked for a continuance "to allow the caregivers Mr. and Mrs. N[.] time to understand and manage the children's behavior with the new ISFC program and services." The Department also asked the court to decrease parents' visitation time.

On November 6, 2020, the Department simultaneously provided the court its section 366.26 report and a status review report.  The Department explained that, before the children moved into the N.s' home in late February 2020, the children and the N.s had experienced a successful placement process, including two overnight visits.  Unfortunately, soon after the children transitioned to the N.s' home, the pandemic forced the family to stay home and school to move to remote learning. The stay-at-home order was difficult for this very active family. Normally, the N.s would plan many outings to release pent-up energy.  The pressure of the pandemic during the time when the children were adjusting to their new home had affected their behavior.

The Department noted that, at one point, the N.s gave a 14-day notice to have the children removed.  During a teleconference, the N.s revealed they had had a "rough week

---

[6]     ISFC stands for "Intensive Services Foster Care."

with the children's behavior." They had since changed their mind and wanted to continue caring for the children. The children had begun in-person day care, which had improved their behavior, and had begun to receive in-person services. The ISFC team described the family as having been in " 'crisis mode' due to the children's 'defiant' behaviors for the past 8 months."

The Department detailed the delays the children had had in accessing mental health services due to the pandemic. J.S.C. and N.C. began receiving ISFC mental health services in August 2020. In late August 2020, J.S.C. was diagnosed with ADHD and prescribed psychotropic medication (Adderall). N.C. also was diagnosed with ADHD and prescribed psychotropic medication (Tenex).

J.S.C.'s and N.C.'s therapist submitted progress letters for the Department on October 7, 2020. J.S.C's treatment goals were to reduce his defiant behavior—described as "secondary to trauma"—such as talking back, shutting down, and saying "no," from occurring daily to four days per week, and work toward eliminating his physical aggression by decreasing those acts to three days per week from five days per week. N.C. similarly was to reduce her daily defiant behavior to five days per week, and her physically aggressive acts to five times per day instead of 10 times per day.[7]

Both children were actively engaged in therapy and had increased their ability to express their feelings. J.S.C. had not been meeting his goals, however. He had regressed recently and struggled to follow directions to address his behavior. He also

---

[7] J.S.C.'s and N.C.'s September 30, 2020 quarterly needs and services reports detailed similar goals.

expressed homicidal ideation, for the first time since beginning treatment, stating, " 'I can just kill you all.' "  The therapist noted J.S.C. currently was "unable to manage upsetting thoughts and feelings."  N.C. also had been aggressive, defiant, and unable to manage her feelings when upset.  Both the N.s and the ISFC team had noticed a correlation between the regression in the children's behavior and an increase in parents' calls.

During team meetings in September and October 2020, the N.s said they wanted to care for the children permanently and had noticed an improvement in J.S.C.'s and N.C.'s behavior since they began their psychotropic medication.  The N.s noted, however, that the children were " 'defiant' " after returning from their weekly in-person visit with father.[8]  They also would kick and hit the N.s and each other.

By November 2020, when the report was filed, the N.s, who described themselves as " 'not generous graders,' " said they were 100 percent committed to adopting K.S.C. and N.C. and about 70 percent committed as to J.S.C.  The N.s were committed to working toward adoption, however.

As for the children, J.S.C. said he was "fine with adoption," but wanted to continue to see father.  K.S.C. wanted to be adopted and was happy with the N.s.  N.C., at only five years old, could not make a meaningful statement.

Adoption remained the children's permanent plan.  The Department noted the children continued to require ISFC

---

[8]     Mother and father had been having separate, monitored virtual visits twice a week with the children since the pandemic's onset.  Father had resumed in-person visits with the children for two hours on Sundays.

services.  The family, however, would qualify for only the less intensive APSS services after the adoption was finalized.  As the children needed more time to adjust to living with the N.s, and the N.s were not yet 100 percent committed to adopting the sibling set, the Department asked the court to continue the December 1, 2020 section 366.26 hearing.  The Department wanted more time to ensure the family remained an adoptive match and to allow the N.s "to grow into their role as active caregivers by learning how to independently manage the children" with the techniques they had learned.  The court continued the section 366.26 hearing for six months, but declined to change parents' visitation.

In January 2021, father filed a section 388 petition asking the court to reinstate his reunification services.[9]  In its March 3, 2021 response to father's petition, the Department reported the children had expressed increased anxiety after learning about father's petition from the N.s.  The social worker interviewed the children on February 24, 2021.  J.S.C. was scared to return to father.  He said he wanted to be adopted because he would be able to go on to a higher grade with the N.s, and they took the children places and bought them things.  K.S.C. also was concerned about his education.  He felt a " 'tiny [bit] excited and a little bit scared' " about the prospect of returning to father.  He liked living with the N.s because they had " 'a nice house' " and bought the children " 'nice things.' "  When asked about his wishes, K.S.C. responded, " 'I don't know what I want, I want what the judge says.' "  N.C. said she enjoyed her visits with

---

[9]     The court set a hearing on father's petition but ultimately denied the petition.

18

father, " 'a lot, because they were able to play at the park.' "
She wanted to live with the N.s, but also wanted to see father.

In another section 366.26 report, filed April 13, 2021, the Department noted that, since the last reporting period, the N.s had "taken the initiative" and were "meeting the children's needs independently." The children continued to receive therapeutic and adoption promotion support services from Five Acres. The N.s stated the children's behavior "remain[ed] challenging at times," but had improved. The N.s credited the positive improvement to the intensive therapeutic services the children were receiving. On April 2, 2021, the N.s told the social worker they were "looking forward to adopting the children and making them a permanent part of their family."

The Department noted the N.s' seven-year-old biological son, who had special needs, had a close relationship with the three children. The children referred to the N.s as " 'mom and dad' " and were affectionate toward them. The N.s were committed to adopting the children and providing them with a loving, happy, and stable home. The children, in turn, told the social worker they wished for the N.s to adopt them and were happy living with the N.s.

In its May 14, 2021 status review report, the Department noted the children had adjusted well over the past six months and shared a positive relationship with the N.s. According to the social worker who had visited the family, the children "appeared to be developing age appropriately . . . [were] extremely active, content, healthy, full of energy, very charismatic, easy going, friendly, talkative, [and] able to express their needs and wants."

On January 22, 2021, the therapist again submitted progress letters for J.S.C. and N.C. The therapist noted J.S.C.'s

progress had been inconsistent since being placed with the N.s due to "multiple stressors," including having to participate in distance learning. The therapist also noted an increase in calls with parents in August 2020—from once a week to three days per week—had contributed to a disruption in J.S.C.'s routine and structure leading to an increase in J.S.C.'s defiance, physical aggression, and poor self-regulation. After each call and weekend visit, J.S.C. would become defiant, refuse to listen, refuse to engage in visits and calls, and become disruptive at daycare. N.C similarly experienced an increase in her defiance toward the N.s and others and physical aggression toward her brothers. When father's in-person visits were put on hold in December 2020 due to rising COVID-19 infection rates, J.S.C. was better able to self-regulate, leading to more positive behavior. N.C.'s behavior also improved.

In January 2021, J.S.C. and K.S.C. were found eligible to receive IEP services. N.C. was doing well academically and not eligible for those services. The children had resumed in-person classes and said they enjoyed going to school. When issues arose concerning J.S.C.'s and N.C.'s behavior at daycare and school, the N.s were able to speak to the children and address the problem successfully.

The Department mentioned the N.s had changed their parenting style to one that was more structured and with more follow-through on directives. And, with the help of the ISFC team, the N.s now were able to redirect the children when they showed difficulty adjusting to schedule changes, such as becoming defiant and unable to transition back to the family's schedule after visiting father. During monthly team meetings, the N.s and providers noticed the improvement in all the

20

children's behavior and had no significant behavioral concerns to report. The N.s continued to express their interest and willingness to adopt the children.

The Department expressed its concern that, because the family was dependent on the ISFC team for guidance and support, it would be difficult for the N.s to ensure the children's mental health needs without that support. The Department did not want the N.s to become discouraged again if the children's negative behavior increased. It wanted the family to show "their full commitment" to the children by ensuring they would be able to provide for their needs with little to no support from support staff. The Department had discussed its concerns with the team, however, and they were "currently be[ing] addressed." The Department continued "to support and work with the children's team to alleviate some of the famil[y's] concerns and find confidence in their knowledge and community resources." The Department stated the N.s "continue[d] to be proactive and vocal of ensuring the children['s] needs [were] being met."

Father filed a second section 388 petition, but the court denied it without a hearing. The court continued the June 1, 2021 section 366.26 hearing for a contested hearing at father's request. The court also appointed Ms. N. the holder of the children's educational rights, over father's objection.

DCFS submitted an interim review report on June 25, 2021, stating the children had expressed their desire to have the N.s adopt them. J.S.C. told the social worker he felt happy to be adopted. He said, " 'they are good people, and I really like them[,] and we are going to be a family.' " He added, " 'I love it here, this is my home, and I want to be adopted.' " K.S.C. described the N.s as " 'one of the best parents. This is the best

house I have ever had. Because they treat you good, they stand up for you, they respect me, they give me stuff, they give so much love, and they care about me, I like it here, I am going to do well here. This house is my life and yes of course I want them to adopt me.' " N.C. said she wanted " 'to get adopted today.' " She asked the social worker to call mother and father " 'step mom and step dad,' " explaining the N.s were her " 'mommy and daddy.' "

The N.s told the social worker, " 'We are fully committed and willing to provide these children a permanent, safe home under adoption.' " The Department recommended the court terminate parental rights.

At the July 1, 2021 contested hearing, the court received into evidence the Department's various reports and attachments filed over the past two years and heard argument from counsel. The children's counsel joined with the Department in asking the court to terminate parental rights and free the children for adoption by the N.s. Counsel noted the children had been "incredibly clear about their wishes to be adopted by" the N.s, with whom they had been living for "well over a year." Both parents objected.

Father's counsel argued adoption was not the appropriate plan at that time, noting the N.s had "waver[ed]," and the Department's report indicated the children still wanted to see father. Counsel asked the court to consider legal guardianship instead of adoption.

Noting it had read and considered the Department's reports and listened to argument, the court stated, "These children want to be adopted." It terminated parents' parental rights and designated the N.s as the children's prospective adoptive parents. The minute orders of the hearing relating to each child reflect:

"The Court finds by clear and convincing evidence that the child is adoptable." Mother appealed.

## DISCUSSION

Mother contends the juvenile court failed to determine if the children were likely to be adopted within a reasonable time, and the evidence is insufficient to support an implied finding that the children were adoptable. She asks us to reinstate her parental rights and remand the matter to the juvenile court to determine whether the children are adoptable by clear and convincing evidence.

### 1. *Standard of review and applicable law*

Before the juvenile court may terminate parental rights, it must determine "by clear and convincing evidence that it is likely the child will be adopted within a reasonable time." (*In re J.W.* (2018) 26 Cal.App.5th 263, 266 (*J.W.*); § 366.26, subd. (c)(1).) "The 'likely to be adopted' standard is a low threshold." (*J.W.,* at p. 267.)

We review the juvenile court's finding of adoptability for substantial evidence. (*In re Mary C.* (2020) 48 Cal.App.5th 793, 803 (*Mary C.*).) Because that finding had to be established by clear and convincing evidence, we review the record as a whole to determine if it "contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.) In doing so, we must view the record in the light most favorable to the Department, as the prevailing party, "and give appropriate deference to how the juvenile court may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Ibid.*)

The issue of adoptability focuses on the child. The court generally considers whether the child's age, physical condition, and emotional state make it difficult to find a person willing to adopt that child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) "Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family." (*Id.* at pp. 1649–1650, italics omitted.) Thus, when a child is "generally adoptable," the juvenile court need not inquire into the suitability of the prospective adoptive parents. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061; see also *In re Scott M.* (1993) 13 Cal.App.4th 839, 844 [section 366.26 hearing does not provide forum for parents to contest the " 'suitability' " of prospective adoptive family].)

On the other hand, "[w]hen a child is deemed adoptable only because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether [the parent] is able to meet the needs of the child." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.)

The law, however, does not require a juvenile court to find a dependent child " 'generally' or 'specifically' adoptable" before terminating parental rights. (*Mary C., supra*, 48 Cal.App.5th at p. 802; see also *In re A.A.* (2008) 167 Cal.App.4th

1292, 1313.) Rather, all that is required is clear and convincing evidence of the likelihood that the child will be adopted within a reasonable time. (*Ibid.*; § 366.26, subd. (c)(1).)

## 2. *Substantial evidence supports the adoptability finding*

The juvenile court did not make any explicit findings on the record at the July 1, 2021 section 366.26 hearing concerning the children's adoptability, other than to state they wanted to be adopted and to find the N.s were the prospective adoptive parents. The minute orders from the hearing, however, reflect the court found "by clear and convincing evidence" that each child was adoptable. Accordingly, we reject mother's contention that the juvenile court "failed to make the statutorily-required finding that the [children] are adoptable." In any event, as mother notes, a finding of adoptability may be implied if supported by substantial evidence. (*In re Kristin W.* (1990) 222 Cal.App.3d 234, 253.)

Based on the evidence, the juvenile court reasonably could find it highly probable that the children were likely to be adopted within a reasonable time. " ' "[I]t is only common sense that when there is a prospective adoptive home in which the child is already living, and the only indications are that, if matters continue, the child will be adopted into that home, adoptability is established." ' " (*J.W., supra*, 26 Cal.App.5th at p. 268.) Here, by the time of the hearing, the children had been living with the N.s for 16 months, and the N.s had expressed their commitment "to adopting the children and providing them with a loving, happy, and stable home." Moreover, the case was "adoption ready," and the Department had found there were no impediments to the N.s adopting the children. By all indications,

therefore, the children would be adopted into the N.s' home if the case moved forward.  The Department also had assessed the children as likely to be adopted back in December 2018.

Mother contends J.S.C.'s and N.C.'s "numerous mental health and behavioral issues" preclude an implied finding that the sibling group was generally adoptable.  Mother notes J.S.C. had been diagnosed with both Moderate Oppositional Defiant Disorder and ADHD, K.S.C. had been diagnosed with Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, and N.C. had been diagnosed with Oppositional Defiant Disorder and ADHD; J.S.C. and K.S.C. had IEPs; J.S.C.'s and N.C.'s behaviors required intensive services—J.S.C. was physically aggressive, defiant, and emotionally closed off almost daily, and N.C. was verbally and physically aggressive and defiant numerous times a day; and both J.S.C. and N.C. were prescribed psychotropic medications.  She also describes the N.s' own struggles with the children's behavior, reflected in the record, their initial reticence about adopting J.S.C., and their dependence on ISFC's intensive services to manage the children's behavior.

Undoubtedly, the children—particularly J.S.C. and N.C.— had mental health and behavioral challenges.  Yet, as our colleagues in Division Six noted, "[v]ery few children in the dependency system are without problems."  (*J.W., supra*, 26 Cal.App.5th at p. 268.)  The children here were relatively young—ages 11, eight, and six—and healthy.  A Department social worker observed the children to be "full of energy, very charismatic, easy going, friendly, [and] talkative."  And the N.s described J.S.C. as "smart and caring," K.S.C. as "sweet, helpful, and smart," and N.C. as "sweet and communicative."

26

Notably, the N.s' willingness to adopt the sibling set despite the children's trying behavior demonstrates those behaviors did not present an insurmountable obstacle to their adoption. (See *In re I.W.* (2009) 180 Cal.App.4th 1517, 1525–1527 [upholding finding that child was adoptable despite child having ADHD, posttraumatic stress disorder, and a learning disorder, and having run away and threatened to commit suicide where child's foster parent had expressed interest in adopting and no impediment to adoption appeared to exist], disapproved on another ground in *Conservatorship of O.B., supra*, 9 Cal.5th at p. 1010, fn. 7.) That Mrs. G., who wasn't interested in adoption, wanted to continue to work with the children—despite their behavior issues—until an adoptive family could be found, also is a testament to their adoptability.[10]

Moreover, when the Department asked to continue the section 366.26 hearing to allow the Department additional time to assess whether the N.s indeed were an adoptive match for the children, the Department did not suggest the children otherwise would not be adoptable. Rather, the Department noted that, by the end of the six-month continuance, it would be able to decide whether to proceed with adoption with the N.s "*or locate another home.*" (Italics added.) Simply put, "[d]isability is not a bar to adoptability." (*J.W., supra*, 26 Cal.App.5th at p. 265 [upholding finding child who suffered from "attention deficit disorder,

_____

[10] Although Mrs. V. asked the Department to move the children due to J.S.C.'s behavior " 'worsening,' " the social worker had not observed any concerning behavior, and Mrs. G. found the children's behavior like that of " 'any kid' their age." The V.s also never intended to adopt due to their own age.

anxiety, [and] 'Reactive Attachment Disorder' " was likely to be adopted].)

Importantly, the juvenile court could infer some of the children's behaviors were exacerbated by their move to the N. home shortly before the pandemic caused schools to close and the state to issue its stay-at-home order. There was a delay in providing mental health services to J.S.C. and N.C., and J.S.C. and K.S.C. were unable to receive speech services under their IEPs. The children, who were struggling to adjust to their new home, also had to contend with remote learning. And, the stay-at-home order had been particularly difficult for this normally very active family. Not surprisingly, the added stress of the pandemic adversely affected the children's behavior.

Some of the children's defiance and outbursts also reasonably were attributable to their visits with parents. (See *J.W., supra*, 26 Cal.App.5th at p. 267 [noting that, in response to parent's argument child was unadoptable due to behavior problems, parent's contact with child was a contributing factor to those problems, and "fost-adopt parents" had been able to successfully resolve many of the child's behavioral issues].) The ISFC team and the N.s both noticed J.S.C.'s and N.C.'s behavior regressed with the increase in their weekly calls with parents and after in-person visits with father. Indeed, the children's behavior was noted to have improved during a period when father's in-person visits with them were put on hold due to a surge in COVID-19 infections. That trigger would be gone once the children were adopted.

In any event, the record also supports an implied finding to a high degree of probability that the children were specifically adoptable by the N.s. Mother contends "there remains a genuine

question whether the N.s can meet the minors' numerous and overwhelming behavioral problems without the intense services that ISFC was providing during the period prior to termination of parental rights." We disagree.

As we discussed, the juvenile court reasonably could infer the N.s' initial difficulty in managing the children's behavior was affected by the unique circumstances of the pandemic. Yet, even during those difficult times, the N.s. made every effort to help the children adjust and to meet their needs. They hired a tutor for the children when their school closed, advocated for the children to receive services, ensured the children participated in their therapeutic sessions and other services, and, once able, took the children on family trips and outings. Significantly, the N.s actively engaged with the ISFC team and participated in PCIT so as to understand the impact the children's trauma had on their development and behavior and thus learn how to respond effectively to the children's triggers.

Given the N.s no longer would have the ISFC team's support, the Department understandably wanted the N.s to take the "initiative" to show they independently could meet the children's needs and stabilize their behavior. The record sufficiently supports the conclusion that the N.s did just that. By April 2021, the Department noted the N.s in fact had taken the initiative and independently were meeting the children's emotional, educational, and developmental needs. And, although J.S.C.'s and N.C.'s behavior remained challenging at times, the N.s noted the children's behavior had improved through their participation in intensive therapeutic services and receipt of prescribed medication. Indeed, as of May 2021, the N.s had reported no significant behavioral concerns.

As mother asserts, in its report filed before the originally scheduled June 1, 2021 section 366.26 hearing, the Department expressed concern about the N.s' transition to providing for the children's mental health needs without intensive support and how they would manage a potential increase in the children's difficult behaviors after that change.  But, the Department also noted those concerns had been discussed and were being addressed.

Moreover, the juvenile court reasonably could find the N.s had alleviated those concerns.  The Department noted the N.s' support team was helping them with the transition, including providing different techniques for the N.s to use to deal with negative behavior and change.  And, the N.s were noted to have in fact learned to address and redirect the children's negative behavior.  They even had changed their parenting style, with the children's behavior improving as a result.  Indeed, in the same report noting its concern, the Department described the N.s as "proactive and vocal of ensuring the children['s] needs [were] being met."

And, although the N.s had not been 100% committed to adopting the sibling set in the past, that was before they had had the additional time to work with the ISFC team.  Even then, the N.s were committed to working toward adoption.  Before the final July 1, 2021 hearing, the N.s unequivocally declared their commitment to adopt the three children and make them a permanent part of their family.  Perhaps most importantly, the children felt supported, cared for, and loved by the N.s.  They looked to the N.s as their parents and family and wanted the N.s to adopt them.

"To deny [the children here] the chance to permanently become [ ] member[s] of the family that loves [them] and that [they] love[ ], simply because [they have] special needs, would derail the entire concept of permanent planning. The evidence shows that the placement is working and that [the children are] adoptable." (*J.W., supra*, 26 Cal.App.5th at pp. 268–269.)

## DISPOSITION

The juvenile court's July 1, 2021 orders terminating mother's and father's parental rights to J.S.C., K.S.C., and N.C. are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

LAVIN, Acting P. J.

LIPNER, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.