Filed 8/16/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re J.W., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B287940 (Super. Ct. No. J069480) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. D.W., Defendant and Appellant. | |

   Children with special needs, such as those suffering from attention deficit disorder, anxiety, or "Reactive Attachment Disorder," may nonetheless be adoptable. Disability is not a bar to adoptability. Three-year-old J.W. suffers, or in the past, has suffered from these disabilities while in his parents' custody. He is now thriving.

   D.W., the biological mother of J.W., appeals from a juvenile court order terminating her parental rights and freeing J.W. for

adoption.  (Welf. & Inst. Code, § 366.26.)[1]  She contends that the evidence does not support the finding that J.W. is likely to be adopted.  We affirm.

*Facts*

In July of 2013, J.W. was placed in protective custody after the police found him and his four-year-old brother playing near a busy road without supervision.  The boys were filthy, dehydrated, and lethargic.  The police found J.W.'s father passed out nearby on a sidewalk.  They arrested him for child endangerment.  Appellant was staying at a nearby hotel.  Both parents have a history of drug abuse, domestic violence, and homelessness.

The boys were medically cleared at Ventura County Medical Center but caused a commotion at the hospital.  During the medical exam, they hit and spit on a social worker, threw temper tantrums, and dumped boxes of latex gloves on the floor.  They also punched and laughed at a second social worker, calling her "mommy."

Ventura County Human Services Agency (HSA) filed a petition alleging that appellant and father were neglecting the children and had a history of domestic violence and substance abuse.  (§ 300, subds. (b) & (g).)  In September of 2013, the trial court sustained the petition, removed the children from the parents' custody, and ordered reunification services and visitation.  At the six month review hearing, the trial court found that appellant had made moderate progress, placed the children back with appellant, and ordered family maintenance services.

In early 2015, HSA removed the children following a domestic violence incident in which father was drunk and fought

---

[1] All statutory references are to the Welfare and Institutions Code.

2

with appellant over a pair of scissors. He was arrested for battery and false imprisonment by violence. A deputy sheriff reported that appellant appeared to be under the influence of prescription pills and "out of it." The children told a social worker that "daddy hit mommy" and that it had happened before.

In May 2015, the trial court granted a petition to return the children to appellant, subject to HSA supervision. In February 2016, the trial court again removed the children because appellant 1. admitted that she drank alcohol, 2. tested positive for amphetamine use, and 3. failed to provide the children a safe and sanitary home.

Caregivers and school authorities reported that J.W. was suffering from emotional "meltdowns" in which he screamed, ran away, hit and kicked people, threw objects, and engaged in acts of defiance. HSA tried to place J.W. and his older brother in the same foster home but it was difficult to find a foster home that would take them. Appellant sabotaged the last joint placement by staging public protests near the foster home, yelling at cars, and displaying photos of the children and foster parents. The trial court found that continued visitation was detrimental to the children. It issued a restraining order enjoining appellant from contacting the children. Thereafter, the trial court terminated visitation and services.

Over the course of three years, J.W. underwent 12 placements including an out of state placement with a maternal uncle, and two placements at Casa Pacifica to evaluate and stabilize J.W. J.W. was diagnosed with ADHD, anxiety and Reactive Attachment Disorder.[2]

---

[2] "Reactive attachment disorder of infancy or early childhood is characterized by a pattern of markedly disturbed

At the permanency plan hearing, the trial court found that J.W. was "specifically adoptable."  J.W. was bonded to his fost-adopt parents who had cared for him for 10 months and were committed to provide J.W. a safe and stable home.  In addition to the adoptability finding, the trial court found that the beneficial parent-child relationship to termination of parental rights did not apply.  (§ 366.26, subd. (c)(1)(B)(i).)

*Adoptability*

Appellant contends that the J.W. is not adoptable.  A juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time.  (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1561.)  The "likely to be adopted" standard is a low threshold.  (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)  On review, "'we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time.  [Citations.]'  [Citations.]  We give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming.  [Citation.]"  (*In re Gregory A.*, *supra*, at pp. 1561-1562.)

---

and developmentally inappropriate attachment behaviors, in which a child rarely or minimally turns preferentially to an attachment figure for comfort, support, protection, and nurturance.  The essential feature is absent or grossly underdeveloped attachment between the child and putative caregiving adults.  Children with reactive attachment disorder are believed to have the capacity to form selective attachments." (American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed 2013) p. 266.)

4

Appellant argues that J.W.'s behavioral problems make him unadoptable. The evidence, however, shows that appellant's contact with J.W. was a contributing factor. When appellant made an unauthorized phone call to J.W. at Casa Pacifica, he became violent and was treated for delusions. After the trial court issued the no contact order and terminated visitation, J.W.'s aggression decreased.

In December 2016, J.W. was placed with his fost-adopt parents who were able to successfully resolve many of his behavioral problems. J.W. considered his foster father to be a hero because he saved him from the shelter. His social worker, Ms. Cox, stated that after J.W. was placed with his fost-adopt parents, he was able to talk about what was going on and control his emotions. The fost-adopt parents went to therapy with J.W., attended parenting groups, asked for support from HSA, and were proactive in providing J.W. a safe and secure home.

Cox testified: "[W]e've seen a total change in [J.W.]. He's a different child than he was when he first moved in where he couldn't be in a room alone, he couldn't go to the bathroom alone, he was afraid of taking a shower." HSA reported that J.W. was "specifically adoptable" and that the prospective adoptive parents were meeting J.W.'s behavioral and emotional needs.

*The Specifically Adoptable Child - Shifting the Adoptability Analysis*

Relying upon *In re Carl R.* (2005) 128 Cal.App.4th 1051, appellant argues that a child who is specifically adoptable is at high risk of becoming a legal orphan if parental rights are terminated and the prospective adoptive family is later determined to be unsuitable. There is a difference between a child who is generally adoptable (where the focus is on the child)

5

and a child who is specifically adoptable (where the focus is on the  specific caregiver who is willing to adopt).  (See Cal. Juvenile Dependency Practice (Cont.Ed.Bar 2018) § 8.27, pp. 703-704; *In re G.M.* (2010) 181 Cal.App.4th 552, 562.)  "When a child is deemed adoptable only because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.  [Citation.]" (*In re Helen W.* (2007) 150 Cal.App.4th 71, 80.)

In *Carl R., supra,* 128 Cal.App.4th 1051, the child suffered from cerebral palsy, severe quadriparesis, a seizure disorder, and uncontrolled and severe psychomotor delay that required total care for life.  Although the child was eight years old, he lived most of his life in a convalescent hospital and had the emotional maturity of an eight-month-old child.  (*Id.* at p. 1058.)  The Court stated that "the issue before this court is very narrow -- what is the proper scope of the inquiry by the juvenile court in determining the adoptability of a child who will require intensive care for life?" (*Id.* at p. 1062.)  The court concluded that if the child is deemed adoptable based solely on the fact that a particular family is willing to adopt, the trial court must consider whether the prospective adoptive parents can meet the child's needs.  (*Ibid*.)  In theory this, in itself, can be a legal impediment to the child's adoption.  (See § 366.21, subd. (i)(1)(D).)

There is no legal impediment here.  Unlike *Carl R.,* J.W. does not require total care for life and has many positive attributes.  It is uncontroverted that the fost-adopt parents are meeting J.W.'s needs and are committed to providing J.W. a loving home that includes a nanny when he comes home for

6

school.  The change in 10 months has been remarkable.  J.W. has "settled down," has adjusted well to home life and school, and received a Student of the Month award at school.  The CASA representative reported that J.W. is "extremely bright and does well in school."  J.W. is healthy, has no developmental problems, is academically on grade level, and has made significant progress in stabilizing his emotions.  He is thriving.

The trial court reasonably concluded that J.W. is likely to be adopted within a reasonable time by his prospective adoptive parents or some other family.  (*In re K.B.*, *supra*, 173 Cal.App.4th at pp. 1292-1293.)  "'[I]t is only common sense that when there is a prospective adoptive home in which the child is already living, and the only indications are that, if matters continue, the child will be adopted into that home, adoptability is established. . . .'" (*Id.* at p. 1293.)  Speculation that J.W. may have future psychological problems does not preclude a finding that he is likely to be adopted.  (*In re Helen W.*, *supra*, 150 Cal.App.4th at p. 79.)

We reject the notion that a child suffering from Reactive Attachment Disorder is unadoptable.  Very few children in the dependency system are without problems.  To deny J.W. the chance to permanently become a member of the family that loves him and that he loves, simply because he has special needs, would derail the entire concept of permanent planning.  The evidence shows that the placement is working and that J.W. is adoptable.  In the words of the trial judge, "I have rarely seen a proposed adoptive situation that was as beneficial to a child as this one. . . .  I have very little question in my mind about the adoptability."

7

This is not a close case.  Substantial evidence supports the trial court's finding, that continuing the parent-child relationship does not outweigh the permanency and stability of an adoptive placement that J.W. so badly needs.  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468; see also *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315.)

*Disposition*

The judgment (order terminating parental rights and selecting adoption as the permanent plan) is affirmed.

CERTIFIED FOR PUBLICATION.


YEGAN, J.


We concur:


GILBERT, P. J.


PERREN, J.


8

Ellen Gay Conroy, Judge

Superior Court County of Ventura

_____

Judy Weissberg-Ortiz, under appointment by the Court of Appeal for Defendant and Appellant.

Leroy Smith, County Counsel, Anthony A. Zepeda, Assistant County Counsel for Plaintiff and Respondent.