Filed 12/14/22  In re V.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| In re V.S. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent, v. J.S., Defendant and Appellant. | E079037 (Super.Ct.Nos. RIJ1500486) OPINION |

APPEAL from the Superior Court of Riverside County.  Cheryl C. Murphy, Judge.

Affirmed.

Sarah Vaona, under appointment by the Court of Appeal, for Defendant and

Appellant.

Minh C. Tran, County Counsel, and Teresa K.B. Beecham and Catherine E. Rupp,

Deputy County Counsel, for Plaintiff and Respondent.

1

J.S. (mother) appeals from orders terminating parental rights to her daughter V.S. (V.) and her son M.S. (M.). Both V. and M. have been diagnosed as autistic and developmentally delayed. F.A. (F.) served as the children's foster mother; at times, she wanted to adopt them, but ultimately she decided not to. The children remained in foster care with F. for six years, because it proved difficult to find a family that was willing to adopt them in light of their special needs. Finally, however, a prospective foster mother stepped forward. She was a crisis therapist and behavioral coach specializing in autistic children and their families. When the children were placed with her, she provided expertly for their special needs; while F. had made great strides with them, they flourished in the prospective adoptive mother's care. After they had been with her for four and a half months, the juvenile court found that the children were likely to be adopted, so it terminated parental rights.

The mother contends that there was insufficient evidence that the children were adoptable. She stresses their special needs and the fact that they had been in the prospective adoptive mother's care for less than five months. We conclude that there was sufficient evidence of adoptability, and these factors did not require the juvenile court to find otherwise.

I

STATEMENT OF THE CASE

In January 2015, the mother gave birth to V. She was 17 at the time; the father, A.S. (father), was 27. The father had three older children who had been removed from his custody.

In April 2015, based on evidence of domestic violence and substance abuse by the father, the Department of Children and Family Services (Department) detained V., solely from the father; it left her in the mother's custody after the mother agreed to a safety plan calling for her to live with the maternal grandfather and to obtain a restraining order against the father. The Department then filed a dependency petition.

During the Department's investigation, the mother admitted using marijuana during pregnancy but claimed she stopped when she learned she was pregnant.

In June 2015, in violation of the safety plan, the mother went to stay with the father. Accordingly, the Department detained V. from both parents and filed an amended petition; it added an allegation that the mother had used marijuana while pregnant. V. was placed in foster care with F.

Later in June 2015, at the jurisdictional/dispositional hearing as to V., the juvenile court found the allegations of the amended petition true; it sustained jurisdiction based on failure to protect (Welf. & Inst. Code, § 300, subd. (b))[1] and, as to the father only, abuse

---

[1] All further statutory citations are to the Welfare and Institutions Code.

of a sibling (§ 300, subd. (j)).  It ordered reunification services for the mother but bypassed them for the father.

In January 2016, the mother gave birth to the father's child M.  The Department detained him and filed a dependency petition regarding him.  He was placed in foster care; six months later, he was placed with F., where V. was already placed.

In April 2016, at the jurisdictional/dispositional hearing as to M., the juvenile court found the allegations of the amended petition true; it sustained jurisdiction based on failure to protect (§ 300, subd. (b)) and, as to the father only, abuse of a sibling (§ 300, subd. (j)).  It bypassed reunification services for both parents and set a section 366.26 hearing.

On the same date, at a six-month review hearing as to V., it terminated reunification services and set a section 366.26 hearing.

Thereafter, the father ignored the dependency; he did not visit the children, appear at hearings, or communicate with the Department.

Despite the termination of her reunification services, the mother engaged in some services voluntarily.  Her visitation was inconsistent, and sometimes she was "overwhelmed" by the children's behaviors.  She repeatedly filed section 388 petitions in the hope of obtaining reunification services and, potentially, custody.

Meanwhile, the section 366.26 hearing was continued over and over again, mostly in the hope of identifying a prospective adoptive family, but sometimes also due to the COVID-19 pandemic.  When it was finally held, in May 2022, the juvenile court found

4

that both children were adoptable and that there was no applicable exception to termination. Accordingly, it terminated parental rights.

II

THE LIKELIHOOD OF ADOPTION

A. *Additional Factual Background.*

At the section 366.26 hearing, the trial court took judicial notice of all reports in the case file. Thus, we consider all of the evidence in all of those reports. (See *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 207-208.)

    1.    *The children's placement with F.*

V. and M. were both born prematurely, at 32 weeks and 36 weeks, respectively.

In July 2016, when V. was a year and a half old, she was diagnosed with global developmental delay. She began receiving physical and occupational therapy from the Inland Regional Center (IRC), plus in-home developmental support from Early Head Start.

As of January 2017, when M. was a year old, he was also starting to show signs of possible developmental delay. In or before August 2017, he, too, began receiving services from IRC and Early Head Start. The social worker believed both children would "require lifelong supportive services . . . ."

In November 2017, V. was diagnosed as having autism spectrum disorder. At 2 years 10 months, she was not talking and had difficulty understanding speech. She had only recently started walking. She could not feed herself. She rarely made eye contact.

5

She did not initiate "social interactions" with peers or adults and did not respond when spoken to. She did not point or use gestures to communicate. However, she was "very happy," "very comfortable in her current placement," and "very attached to her caregiver."

In January 2018, V. started preschool. On the first day, she "cried hysterically." During her second week, F. was called in to the preschool twice in one day because V. was having a "meltdown." By the summer break, however, V. "was doing much better."

In January 2018, M., too, was identified as likely having an autism spectrum disorder. He began receiving additional services for autism. The diagnosis was confirmed in November 2018. At the age of 2 years 10 months, he did not talk or even babble. He did not respond to his name. He was not toilet-trained. He could not feed, bathe, or dress himself. He did not respond to "social overtures." He would not seek help and would not seek comfort when he was hurt. Nevertheless, M. was "happy," "always smiling," and he "never gave [F.] any trouble at all." He could "demonstrate fondness/affection to familiar adults."

In May 2018, V. was diagnosed with pica, a symptom of autism. She had been eating her own feces; later, she began eating her own hair. F. was able to get these behaviors under control by having V. wear a body suit under her clothes and by keeping her hair short.

As of February 2019, V. and M. were no longer eligible for IRC services. However, they were receiving services through their school. V. also received services

6

from the Foster Family Agency (FFA) and In-Home Supportive Services (IHSS).  After February 2020, M. also received services through FFA and IHSS.  Both V. and M. had individual education programs.

Over the 2019-2020 holidays, F. went on a trip; the children were in respite care for two weeks.  She reported that "the children regressed and it took her about two weeks to get them back on track. . . .  V[.] and M[.] were out of control. . . .  [T]hey were crying for no reason . . . and . . . they were having tantrums, and not staying in their beds at night."

In January 2020, M. "was diagnosed with a more severe form of autism, intellectual disability, and a speech impairment."  He was therefore transferred to a school that could "provide[] . . . more specialized services."  Around this time, he was "putting . . . anything . . . he could find" in his mouth.  However, he was "always happy and smiling.  He [wa]s very sweet, calm and d[id] not get easily frustrated."  Though still nonverbal, he was "sociable and enjoy[ed] other people."

As of March 2020, M. had started biting people.  In May 2020, he started "putting his hand down his mouth and making himself throw up."

As of August 2020, V. needed the TV left on "day and night"; if it was turned off, she threw a tantrum until it was turned back on.

In September 2020, a psychiatrist recommended Risperdal (a psychotropic medication) for M. because he:  "Has middle insomnia and awakens 2 or 3am screaming

7

and crying . . . .  Is aggressive and has often bitten others drawing blood.  Puts finger down throat and vomits and then eats vomit."

The Risperdal reduced the biting and enabled M. "to sit through school via distant learning."  After his dosage was adjusted, he was "sleeping a bit better, not biting as much, and not throwing as many tantrums."

In October 2020, M. started "spac[ing] out" and "shaking sometimes."  A neurologist found "some abnormalities in his brain activity."  The neurologist suspected seizures but declined to make a diagnosis.  Later reports do not mention this behavior nor any seizures.

Starting in November 2020, M. stopped receiving FFA services, but started receiving 30 hours of behavioral services, six hours of occupational therapy, and one hour of speech therapy a week.

As of February 2021, both V. and M. were making progress.  V., at age six, was toilet-trained at home, though she wore pull-ups at night and outside the home.  She "continue[d] to learn new words every day."  She could say "wash hair, hot, and bubbles."  She could recite the alphabet, count up to 20, and say the days of the week.  She could also communicate by pointing.  She could understand and follow directions.  She was "doing well" in school, despite distance learning.  She "was very focused on what the teacher was saying."  She would "follow along, singing and making gestures with her hands."

M., at age five, could say "clap" while clapping his hands. He was still making himself throw up, but not as often. He had been waking up and crying in the middle of the night. On his doctor's recommendation, however, F. started giving him melatonin, "and it seemed to be helping . . . ." Previously, he had not been getting anything out of preschool via distance learning, but with Risperdal, it was "a little bit" easier to keep him interested.

2. *Interest in adopting the children.*

F. waffled over adopting the children.

As of July 2016, she was willing to adopt them. By December 2016, she had changed her mind, because her husband "was not fully committed to caring with V[.]'s developmental delays and physical needs." However, she was willing to provide long-term foster care or possibly legal guardianship.

By December 2017, F. had changed her mind again and was willing to adopt.

By February 2018, F. had gone back to being willing to accept a legal guardianship, but not adoption. She explained that she had been told that she could not foster other children during the adoption process. In April 2018, the social worker asked her to reconsider. She said that her husband was the obstacle, and she could not change his mind.

In October 2018, F. decided that she did not want legal guardianship, either, although she was willing to continue to provide long-term foster care.

9

Meanwhile, the Department was having difficulty finding a prospective family "[d]ue to the children's special needs . . . ." The Matching Unit social worker said that "she has had a few interested families, but once she provides them with more information about the children's special needs, they back out."

In March 2017, the Department found a prospective adoptive home. "Unfortunately, after the prospective adoptive parents considered the needs and requirements of caring for children with special needs, the family declined proceeding with the adoption."[2]

In September 2017, a maternal aunt said she was interested in adoption. Two months later, however, she changed her mind. "She stated she considered the needs and requirements of caring for children with special needs and concluded that she could not take on that kind of responsibility."

The Department widened its efforts. It listed the children on the Riverside County Heart Gallery and California Kids Connection websites, and it presented information about them at Adoption Family Fairs, "matching picnics," and "cooperative exchange

---

[2] In a later report, the social worker said that, in April 2017, the Department had a meeting with prospective adoptive parents. However, in May 2017, they "decided to pass . . . ." This seems to refer to the same prospective adoptive parents as those located in March 2017.

events" with outside adoption agencies.[3]  This resulted in "full disclosure meetings" with four potential adoptive families.

In August 2018, the first family "felt that they could not meet the children's needs long-term, due to their special needs."

In April 2019, the second family decided not to move forward.  "[T]hey felt some worries about what the children's future would look like and they felt they could not meet their needs long-term."

In November 2019, a third family "felt that they could not meet the children's needs long-term, due to their special needs."

A fourth family was interested, even after a full disclosure meeting, but could not accept placement unless and until their current foster placement ended.  They ended up adopting their current foster child.

The Matching Unit social worker became concerned that the children might have to be separated in order to be adopted.

3.  *The children's prospective adoptive placement.*

In February 2021, a potential adoptive mother found the children through an adoption website and contacted the Department.  She lived in Pennsylvania; she worked as a behavioral coach and crisis therapist for autistic children and their families.

---

[3]      It appears, however, that the Department never actively sought prospective adoptive parents out of state.

After a full disclosure meeting, she still wanted to move forward. She said she had "no concerns," the children sounded like "great, fun kids," and she was "confident" that she could provide for them. In June 2021, she started having online visits with the children, usually twice a week, for 30 minutes at a time.

In September 2021, with the juvenile court's approval, the Department started the ICPC process. In December 2021, it received ICPC approval.

Meanwhile, F. started finding "bruises and marks" on V. when she got home from school. On November 15, 2021, V. went back to school after 10 days off with COVID. According to F., when she left home, she had no bruises. Later that day, a social worker visited V.'s school. She saw staff there being "rough" with V., "grabbing her arms, and forcefully [and] aggressively moving her to the room."[4] The teacher showed her bruises on V.'s wrists and legs. The school reported the injuries to the Department and apparently also to the San Bernardino social services agency.

San Bernardino social workers went to F.'s home at midnight, made her wake up the children, and questioned them. Her husband was "very angry" and wanted her "to turn over the children." On November 30, 2021, F. gave a 30-day notice to terminate the placement.

---

**4**     A school staff member later said that V. was "very unsteady" when she walked. Several staff members at a time would have to hold her to help her move from place to place. She fell a lot and "always" had bruises on her legs.

On December 29, 2021, V. and M. were placed with the prospective adoptive mother.

V. "ma[de] progress in her development every day." Her speech was "getting better and better as she sees that when she uses words things are easier, she is understood . . . ." She was learning new words every day. The prospective adoptive mother said, "I constantly talk to her and teach her what things are, their function and how to label items . . . ." V. was able to follow directions. She was also learning to dress herself. Her gait was improving. "Her awareness and alertness of others ha[d] increased. She now greets everyone and attempts to engage with them." Her toilet-training had regressed, but only because, when she went back to in-person school, the school made her wear pull-ups.

According to the prospective adoptive mother, M. "could do a lot more things than what was initially thought." He could say a few words, and he understood normal conversation "with little issues." His balance was improving. He could feed himself "with minimal help." Reportedly, "[h]e enjoys company of all ages, will go to them to give hugs, sits with them, and plays tickle. He will bring books or a toy to [the prospective adoptive mother] and [her] family members to play with him." The prospective adoptive mother had begun toilet-training him.

The prospective adoptive mother let the children jump on the bed and on a trampoline; she gave them baths every night before bedtime. Perhaps as a result, they were both sleeping through the night; V. no longer needed the TV on. She provided them with "sensory" equipment designed to calm and comfort autistic children, such as a foam

13

mat on the floor, a rocking chair, a yoga ball, a body sock, a "peapod," and a "crash pad." Both children appeared comfortable with the prospective adoptive mother.

An adoption assessment of the prospective adoptive mother, in February 2022, was favorable. It found that "V[.] and M[.]are both making a healthy transition to their new home and community. Although many thought they would struggle with this placement change, V[.] and M[.] have proven to be more resilient than thought. They are both sleeping and eating well. They are learning new coping skills that are tailored to their individual sensory and developmental needs, which they are responding well to . . . ." It concluded that "The prospective adoptive mother has the capability, training, empathy and understanding to care for V[.] and M[]." "She has prepared her home to be physically safe for a child and is prepared to parent a child with special needs."

At the time of the section 366.26 hearing, V. was seven and M. was six. They had been placed with the prospective adoptive mother for four and a half months.

B.    *Additional Procedural Background.*

As already stated, the juvenile court found that the children were adoptable. It said:

"The Court certainly recognizes and notes that the minors are both special needs, that they are on the autistic spectrum. That, unfortunately, while the children were here in California, there was not a caregiver willing and able to provide permanency by way of adoption. [¶] . . .

14

"[T]he children really are thriving and doing well, in that the caregiver who is a behavioral specialist really is an individual who doesn't necessarily have to rely solely on medical professionals and behavioral specialists to assist in the care and attention needed for the children. But this person really has the skills and experience necessary to meet the needs of the children. . . .

"And I say all of that, because the Court believes that with mother's inability to reunify with the children . . . , that it is important to determine if this placement would, in fact, be a placement where the children are likely to be adopted. And this Court does believe that this placement does provide that opportunity.

"And certainly it's unknown what potentially could occur down the road, but that's not for this Court to make judgment call on. The Court is to look at this moment in time, if there is likelihood of adoption. And the Court does believe that to be case."

C.    *Discussion.*

"A juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. [Citation.] . . . On review, '"we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time. [Citations.]" [Citations.] We give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming. [Citation.]' [Citation.]" (*In re J.W.* (2018) 26 Cal.App.5th 263, 266-267.)

15

"There is a difference between a child who is generally adoptable (where the focus is on the child) and a child who is specifically adoptable (where the focus is on the specific caregiver who is willing to adopt). [Citations.]" (*In re J.W.*, *supra*, 26 Cal.App.5th at p. 267.)

"'A child's young age, good physical and emotional health, intellectual growth and ability to develop interpersonal relationships are all attributes indicating [general] adoptability.' [Citation.]" (I*n re I.W.* (2009) 180 Cal.App.4th 1517, 1526, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) "To be considered adoptable, a minor need not be in a prospective adoptive home and there need not be a prospective adoptive parent "'waiting in the wings.'" [Citation.] Nevertheless, 'the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family*.' [Citation.]" (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.)

On the other hand, "a minor who is not generally adoptable because of age, poor physical health, physical disability or emotional instability may nevertheless be [specifically] adoptable because a prospective adoptive family has been identified as willing to adopt the child. [Citation.] 'When a child is deemed adoptable *only* because a particular caretaker is willing to adopt, the analysis shifts from evaluating the

16

characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.' [Citations.]" (*In re R.C.*, *supra*, 169 Cal.App.4th at p. 494.)

The fact that the prospective adoptive mother was willing to adopt was some evidence that the children were generally adoptable. The mother points to the fact that, after considerable waffling, F. and her husband decided not to adopt and not even to accept legal guardianship. This ignores the fact that F. lovingly cared for the children for *six years*. Moreover, the placement did not end because she became unwilling to provide care; it ended only because San Bernardino social workers rousted her due to bruises that Riverside social workers suspected were caused by V.'s school.

Although she ended up unwilling to adopt, she repeatedly affirmed that she was willing to continue to provide long-term foster care for as long as it took for the children to be adopted. Moreover, according to F., her husband was the obstacle to adoption. The juvenile court could reasonably conclude that, with a more amenable husband, F. would have been willing to adopt.

Nevertheless, we may assume, without deciding, that the children were not generally adoptable. Even if so, there was substantial evidence that they were specifically adoptable. The prospective adoptive mother's willingness to adopt the children was established. The Department did not locate her; rather, she located the children on the internet and reached out to the Department. She had a pre-existing interest in the care of autistic children. After she had been caring for them for two and a

17

half months, she filed caregiver information statements urging the juvenile court to "move to terminate rights so that we can begin the adoption process."  She said, "Every[ ]day isn't perfect[] and it is a learning process.  One I would love to continue."  At the time of the section 366.26 hearing, a further two months down the road, she was still committed to adoption.

The mother suggests that a placement of less than five months could not provide sufficient evidence of adoptability.  Even before the placement, however, the prospective adoptive mother had been having online visits with the children, usually twice a week, for at least 30 minutes at a time.  The mother also suggests that online visits with nonverbal children could not possibly be effective.  According to F., however, the prospective adoptive mother "engages them by playing songs and videos for them."

As there was ample evidence that the prospective adoptive mother was willing to adopt, we turn to "'whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.' [Citations.]" (*In re R.C.*, *supra*, 169 Cal.App.4th at p. 494.)

There was no legal impediment.  And the evidence showed that the prospective adoptive mother was able to meet the children's needs.  She was superbly qualified to parent two autistic children.  She had "strong coping skills."  "She [wa]s open to receiving help from her mother, sisters, and professionals, as necessary."  She was *already* meeting the children's needs; they were thriving in her care.  The adoption assessment concluded that she "is prepared to parent a child with special needs."

18

The mother argues, "Over these children's lives, many new and more severe issues have arisen, and more may continue to arise as they get older . . . ." This is sheer speculation. (See *In re J.W.*, *supra*, 26 Cal.App.5th at p. 268 ["Speculation that J.W. may have future psychological problems does not preclude a finding that he is likely to be adopted."].)

The mother also attacks the juvenile court's remark that "[t]he Court is to look at this moment in time . . . ." She argues that it erred by failing to consider "whether this home was willing and able to provide for the particular needs of these children, in the long term." The court's full remark, however, was: "The Court is to look at this moment in time, *if there is likelihood of adoption*." (Italics added.) That was correct; that is the law. (§ 366.26, subd. (c)(1).) It was not supposed to consider *the likelihood of adoption* at any other time (and it hardly could).

As in almost every appeal involving adoptability, the mother raises the specter that the adoption might not go through, leaving the children "legal orphans." "Very few children in the dependency system are without problems. To deny [a child] the chance to permanently become a member of the family that loves him and that he loves, simply because he has special needs, would derail the entire concept of permanent planning." (*In re J.W.*, *supra*, 26 Cal.App.5th at pp. 268-269.)

The mother relies on *In re Carl R.* (2005) 128 Cal.App.4th 1051 (*Carl R.*). *Carl R.*, however, merely held that, to prevent a "total needs" child from becoming a legal orphan, the juvenile court must consider not only whether there is a legal impediment to

19

adoption, but also "whether the prospective adoptive parents can meet that child's needs . . . ." (*Id*. at p. 1062.)  Here, the juvenile court did specifically consider whether the prospective adoptive mother could meet the children's needs, and it found she could.

In any event, the "legal orphan" argument is outdated.  "In 2005, [section 366.26] was amended to add subdivision (i)([3]), which provides that if a child has not been adopted after three years following the termination of parental rights, the child may petition the juvenile court to reinstate parental rights.  [Citation.]  Thus, under the current statute, there is no danger of the children becoming legal orphans."  (*In re I.I.* (2008) 168 Cal.App.4th 857, 871.)

In sum, then, the trial court's finding that the children were adoptable was supported by substantial evidence.

III

DISPOSITION

The orders appealed from are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.


We concur:

McKINSTER
J.

MENETREZ
J.

20