Filed 5/21/24  In re B.M. CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re B.M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D083349 |
| Plaintiff and Respondent, | (Super. Ct. No. J518843A) |
| v. | |
| A.J., | |
| Defendant and Appellant. | |
| B.M., a Minor, etc., | |
| Appellant. | |

APPEALS from orders of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.


Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant A.J.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Minor and Appellant B.M.

Claudia Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

A.J. (Mother) appeals from orders terminating parental rights to her child, B.M. (Child), after a Welfare and Institutions Code[1] section 366.26 hearing.  Mother contends that the juvenile court erred by finding Child generally and specifically adoptable by clear and convincing evidence.  Child joins Mother's opening brief.

We conclude there is substantial evidence in the record to support the court's adoptability findings.  We therefore affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Child lived with Mother, Mother's partner (Edward), and her child with Edward (Sister).  On October 12, 2021, Edward was arrested for child endangerment while caring for Child, who was eight years old.  Law enforcement could not locate Child's parents and took him into protective custody.

On October 13, 2021, the San Diego County Health and Human Services Agency (Agency) filed a Juvenile Dependency Petition on behalf of Child citing neglect by Mother.  At the detention hearing the following day, the court found the petition satisfied prima facie requirements for detention, detained Child out of Mother's care, and ordered reunification services for Mother.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

Mother had a history of heroin use, including while she was pregnant with Child. In 2013, Child was removed from Mother shortly after birth, and Mother later successfully reunified with Child. Child's father did not participate in reunification services, which were therefore terminated.

During early interviews, Mother admitted that in the months before Child's detention in this case, she had relapsed on heroin and had used it on October 12, 2021. She explained that Edward was physically abusive to her and controlling of her. She was in a relationship with him despite also having a restraining order against him.

Child stated Edward perpetrated domestic violence on Mother. Child also shared that Edward took photos and videos of Child using the restroom and showering and watched pornography with Child. Despite these circumstances, the Agency described Child as a caring, sensitive, sweet child who loved Mother.

After the Agency filed an amended petition to include exposure to domestic violence and Mother's heroin use, the court held a jurisdictional and dispositional hearing and set the matter for trial. At the January 6, 2022, contested hearing, the court sustained the amended petition, removed Child from Mother, ordered reunification services, and confirmed its order for supervised visitation.

In early 2022, Child struggled with recurring stool accidents and was later diagnosed with encopresis, a condition preventing him from ascertaining when he needed to use the bathroom. Child was diagnosed with ADHD and began taking medication in April 2022. He was doing well in school and at the home of his initial caregiver, Sarah, but had behavioral issues during his afterschool program. His therapist reported that he was an

intelligent, charming, and great kid, but, according to Sarah, he had difficulty connecting with and maintaining relationships with service providers.

In June 2022, Child's Court Appointed Special Advocate (CASA) reported that he was outgoing, energetic, and fun loving, and that he continued to do well in his placement. However, the CASA reported Child had made little progress in therapy.

In its July 2022 status report, the Agency reported that Mother did not participate in substance abuse treatment and was discharged from a domestic violence victim's group after ceasing to attend. She failed to appear for on-demand substance abuse testing requested by the Agency. The Agency reported difficulty in communicating with Mother to discuss her desire to participate in the reunification process. Mother had ceased responding to the Agency's communication attempts in March 2022. According to Sarah, Mother frequently canceled visits with Child, and her last visit occurred on April 18, 2022. Mother subsequently ceased responding to Sarah's efforts to schedule visits. The Agency also reported that an investigation had substantiated allegations that Edward had sexually abused Child. Mother continued to have contact with Edward.

On July 6, 2022, the court held a six-month review hearing and maintained Mother's reunification services and visitation. The court noted that Mother had made minimal progress in her case plan.

Meanwhile, Sarah gave notice that she no longer wanted to continue Child's placement with her, and Child was placed with Matthew (Caregiver) in July 2022.

In December 2022, Child's CASA reported that Child was comfortable, happy, and thriving in his new placement. His encopresis continued to result in frequent urination and defecation accidents. He was active in his therapy

4

sessions, and his teacher stated he was outgoing, social, and athletic, but struggled with reading, writing, focusing, and maintaining personal space.

As of its December 12, 2022, report, the Agency agreed that Child was content in his new placement, and Caregiver reported that Child was doing well at home. Mother had not visited Child since April. She did not respond to the Agency's efforts to continue providing reunification services, and her whereabouts were unknown. The Agency was not optimistic about the prospect of Mother completing reunification services. While she had completed a parenting course as part of her services, Mother abandoned her domestic violence group sessions, did not report completing substance abuse treatment services, and did not submit to requested drug testing. The Agency had reason to believe she had contact with Edward despite her restraining order against him. Thus, the Agency remained concerned about Mother's ability to provide an environment for Child that would be free of substance abuse and exposure to domestic violence. Consequently, the Agency recommended that the court terminate reunification services and set a section 366.26 hearing.

Later in December, Mother participated in some video visits with Child. She did not initiate those visits but appeared to enjoy them. Around that time, Mother enrolled in outpatient substance abuse services but failed to participate in the services. The Agency requested a drug test, and Mother declined.

At the January 30, 2023, contested twelve-month review hearing, the court terminated reunification services and set a section 366.26 hearing. The court noted that Mother failed to complete domestic violence and substance abuse services, continued her relationship with Edward despite the restraining order, and did not maintain consistent visitation with Child.

The Agency's section 366.26 report indicated that Child was in overall good health, although he continued to struggle with encopresis and ADHD. He also appeared developmentally on track, was doing well academically, and "present[ed] as a funny, smart, friendly and energetic child" as well as "happy and well adjusted." Child expressed the desire to live with Mother, and, while Caregiver was open to either adoption or guardianship, he wanted to be sure of what Child wanted and what the team thought was best for him.

The report also noted that Edward and Mother had placed Child between them during sexual intercourse, and Edward forced Child to have sexual intercourse with Sister.

In May 2023, the CASA reported that Child was an active, outgoing, social child but demonstrated challenging behaviors at times. He appeared comfortable with Caregiver, who provided a supportive and stable environment and remained open to either adoption or guardianship. Mother still had not completed services, and her whereabouts were unknown.

The Agency requested that the section 366.26 hearing be continued to determine the most appropriate permanent plan for Child. In its September 2023 addendum report, the Agency recommended adoption. The Agency had not been able to locate Mother after a diligent search beginning in March 2023. Caregiver expressed the desire to adopt Child as long as he agrees, rendering him specifically adoptable. The Agency stated that Child was generally adoptable due to Child's "general good health, high intelligence, friendly personality and on-track development."

Child told the Agency that things were "good" at home and with Caregiver, and he "was in agreement with" living with Caregiver until he is an adult. When asked how he would feel about being adopted by Caregiver, Child stated "he would want to be adopted by his mom." At a preliminary

hearing, Child's counsel explained that he was comfortable and doing well in his placement and had all of his needs met but would prefer a lesser permanent plan than adoption.

On December 21, 2023, the court held the contested section 366.26 hearing. At the hearing, the protective services worker (PSW) testified that Child was generally adoptable due to being in good health, developmentally on track, intelligent, active, engaging, and generally well-behaved. She explained Caregiver was willing to adopt Child or act as his legal guardian. Caregiver's home study had been completed and there was no reason he would not be approved for adoption. Child was doing well in the home, and Caregiver would provide continued stability and thus reduce anxiety.

The PSW testified that the Agency had been unable to get in touch with Mother after February of 2023, and Mother had not visited with Child, even virtually, since before then. The PSW acknowledged that Mother's visits, when they had occurred, were positive for Child, and he continued talking about wanting to live with Mother despite the cessation of visits. She further acknowledged that Child understood to some level what adoption is, and he stated he does not want to be adopted because he was worried he would no longer be able to see Mother. However, the PSW explained that Caregiver was "very supportive in keeping [Child] connected to . . . any birth family," as shown by his arranging regular visits with Sister and communication with his grandmother. In sum, the PSW believed adoption was in Child's best interest.

Child testified he knows what the term "adoption" means. He stated he did not want to be adopted by Caregiver, but he did not know why. He preferred legal guardianship to adoption "[b]ecause if my mom got her rights

7

back, I could have her." On the other hand, he would want to be adopted by Sarah, whom he continued to visit regularly.

The court concluded, by clear and convincing evidence, Child was generally adoptable as "a highly intelligent, friendly 10-year-old who is overall healthy and on track developmentally" and adoption is in his best interest. The court noted that Caregiver was willing to adopt Child and found him specifically adoptable. Because no exception applied, the court terminated parental rights and ordered adoption as the permanent plan. In so holding, the court stated that it had considered Child's wishes even though he was under the age of 12, noting that Child was opposed to adoption by his current Caregiver, but not opposed to adoption by his former caregiver.

## DISCUSSION

Mother appeals the court's adoptability finding and orders terminating parental rights. She contends Child's opposition to adoption by Caregiver prevented him from being specifically adoptable, and that the Agency failed to present substantial evidence that Child was generally adoptable due to his opposition to adoption. Rather, according to Mother, legal guardianship would be in Child's best interests. We conclude the record contains substantial evidence supporting the court's finding of adoptability. As no statutory exception applies, the court properly selected the default permanent plan of adoption.

Section 366.26 hearings take place after reunification efforts have failed and services have been terminated. (*In re Caden C.* (2021) 11 Cal.5th 614, 630.) At a section 366.26 hearing, the court selects and implements a permanent plan for the child. (*Ibid.*) Section 366.26, subdivision (c)(1) provides: "If the court determines, . . . by a clear and convincing standard, that it is likely the child will be adopted, the court *shall* terminate parental

8

rights and order the child placed for adoption." (Italics added.) If the court makes the adoptability determination, it may only select a permanent plan other than adoption when a "specifically enumerated" statutory exception applies. (*In re Caden C.*, at pp. 630–631.) As one court explained: "Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child. The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' . . . The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) Those statutory exceptions are enumerated in section 366.26, subdivisions (c)(1)(B)(i)–(vi).

Adoptability falls into two different categories: specific adoptability and general adoptability. (*In re B.D.* (2019) 35 Cal.App.5th 803, 817; *In re J.W.* (2018) 26 Cal.App.5th 263, 267.) A child is specifically adoptable when there is a prospective adoptive parent willing to adopt the child and able to meet the child's needs, and there are no legal impediments to adoption. (*In re B.D.*, at p. 817; *In re J.W.*, at p. 268.) General adoptability depends on "whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor." (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) The existence of a prospective adoptive parent who is willing to adopt a child indicates that the child would likely otherwise be adopted by some other family. (*Id.* at pp. 1649–1650.) Even if there is no prospective adoptive parent, a "child who is happy, healthy and young, with

9

no discernable developmental problems" is generally adoptable. (*In re B.D.*, at p. 817.) The existence of some problems or potential future problems does not prevent a finding of general adoptability. (*In re J.W.*, at p. 268; *In re R.C.* (2008) 169 Cal.App.4th 486, 492 ["[Child's] positive characteristics make him adoptable despite his in utero exposure to heroin, slight speech delays and the absence of an identified father."].)

We review the juvenile court's holding on adoptability for "substantial evidence from which a reasonable trier of fact could find clear and convincing evidence" that the child is likely to be adopted within a reasonable time. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400.) On this record, we conclude substantial evidence exists to support the court's clear and convincing finding that Child is both specifically and generally adoptable.

The substantial evidence in the record that supports the court's specific adoptability finding is that Caregiver expressed willingness to adopt Child, demonstrated the ability to provide for Child's needs during the placement, and completed a home study. The PSW testified there was no reason Caregiver would not be approved for adoption. Mother does not dispute these points but argues Child is not specifically adoptable because he opposed adoption due to a strong attachment to Mother. We disagree that Child's wishes affected specific adoptability. There is no indication in the record that Caregiver would become unwilling to adopt Child once the court followed the Agency's recommendation. Although Caregiver cared about Child's wishes regarding a permanent plan, Caregiver also wanted to know what "the team" thought was best for Child, which was adoption. Thus, from a specific adoptability perspective, substantial evidence exists that Child is likely to be adopted.

Likewise, the Agency's and CASA's reports throughout this case and the PSW's testimony at the section 366.26 hearing provide substantial evidence to support the court's general adoptability finding. Child was consistently described as smart, friendly, generally healthy, developmentally on track, funny, happy, and energetic. He generally did well in his placements and at school. Additionally, the willingness of Caregiver to adopt Child indicates that other parents would similarly be interested in adopting Child.

Mother acknowledges Child's "favorable characteristics" supporting general adoptability; she further concedes "[Child]'s history of trauma, anxiety, ADHD, encopresis, multiple placements, and exposure to substance abuse, sexual abuse, and domestic violence did not render him unadoptable." Nevertheless, Mother argues the court erred by finding Child generally adoptable because there was insufficient evidence that other families would have interest in adopting a child with his emotional and behavioral issues who opposed adoption. We disagree that Child's hesitation to be adopted by Caregiver or the existence of some issues undermine Child's many positive characteristics that render him generally adoptable. This is particularly true given that Child supported living with Caregiver until he was 18 and because Child was not adamantly opposed to being adopted, as demonstrated by his non-opposition to the hypothetical scenario of Sarah adopting him. Furthermore, Mother has not cited to any cases in which a court determined that a child's desire to be with a parent, while understandable, made an otherwise adoptable child unadoptable.

Finally, Mother argues "the juvenile court's adoptability finding and decision to terminate mother's parental rights were contrary to [Child's] best interests." Rather, "the lesser permanent plan of legal guardianship" was

11

preferred by Child, acceptable to Caregiver, and in the best interest of Child. Mother cites to section 366.26, subdivision (h)(1), which states, "the court shall consider the wishes of the child and shall act in the best interests of the child." Mother acknowledges the court was aware of and considered Child's wishes, as stated in the record. Contrary to Mother's argument, however, the court could not have merely "selected the lesser permanent plan of legal guardianship." Adoption, when possible, is deemed to be in the child's best interest, except if a statutory exception applies: "The Legislature has decreed, however, that guardianship is not in the best interests of children who cannot be returned to their parents. These children can be afforded the best possible opportunity to get on with the task of growing up by placing them in the most permanent and secure alternative that can be afforded them. In decreeing adoption to be the preferred permanent plan, the Legislature recognized that, 'Although guardianship may be a more stable solution than foster care, it is not irrevocable and thus falls short of the secure and permanent placement intended by the Legislature.' " (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)

Once the court determined by clear and convincing evidence that Child was adoptable, the court was required to order adoption unless a specific statutory exception applied. Mother does not contend any statutory exception applies. Mother concedes that section 366.26, subdivision (c)(1)(B)(ii), providing an exception when a child objects to adoption, does not apply because child is under the age of 12, and Mother did not maintain regular visitation, which is required for the section 366.26, subdivision (c)(1)(B)(i) beneficial parent-child relationship exception. Absent any applicable exception, we must affirm.

12

## DISPOSITION

The juvenile court's orders are affirmed.


McCONNELL, P. J.

WE CONCUR:


DATO, J.


DO, J.