Filed 3/25/26  In re A.O. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re A.O., a Person Coming Under the Juvenile Court Law. | B349018 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.L. et al.,<br><br>Defendants and Appellants. | (Los Angeles County Super. Ct. No. 22CCJP03402B) |

APPEAL from an order of the Superior Court of Los Angeles County.  Tara L. Newman, Judge.  Affirmed.

Johanna R. Shargel, under appointment by the Court of Appeal, for Defendant and Appellant J.L.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant D.O.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Eden Gharapet, Deputy County Counsel, for Plaintiff and Respondent.

_____

J.L. (mother) and D.O. (father) appeal from the termination of their parental rights to their daughter A.O., arguing that the juvenile court erred in finding her adoptable. Substantial evidence supports this finding, so we affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Mother and father share a daughter, A.O. (born April 2023), and mother has a son, D.S. (born December 2021), with a different father.

On August 27, 2022, D.S. was hospitalized, unresponsive and nearly dead, with injuries that included a fractured skull, bruises in various stages of healing all over his body, and human bite marks. D.S. has been diagnosed with cerebral palsy and will likely "need lifetime therapeutic services, due to significant delays from the injuries." Father (who is not D.S.'s father) was charged, convicted, and served time in jail for D.S.'s injuries. D.S. was discharged from the hospital and placed in foster care in September 2022.

On March 9, 2023, the juvenile court sustained a section 300[1] petition, exerting jurisdiction over D.S. based on mother's history of substance abuse, her allowing father—also a drug user—to reside in the home with unlimited access to D.S.,

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

mother's mental and emotional problems, and allegations related to D.S.'s father.

On April 25, 2023, the Department of Children and Family Services (the Department) filed a section 300 petition as to A.O., who had just been born, based on the serious injuries to her half sibling D.S., mother's substance abuse and mental and emotional problems, father's substance abuse, and both parents' violation of a no-contact order. A.O. was detained from father but was allowed to remain with mother.

On September 27, 2023, the juvenile court sustained the petition with some amendments. A.O. was placed with mother over county counsel's objection and was ordered removed from father. The parents were again ordered to have no contact with each other.

On November 30, 2023, A.O. was removed from mother on an expedited basis after mother and father engaged in violence in A.O.'s presence. She was placed with D.S.'s caregivers.

Supplemental petitions were filed in December 2023 (and sustained in January 2024) based on domestic violence between mother and father and their failure to obey a no-contact order.

A.O. was examined in December 2023 and found to have "Global Developmental Delay." She was found eligible for regional center services, which she began in February 2024.

The caregivers reported A.O. had difficulty sleeping and self-soothing and showed "tantrum like behaviors" when she does not get what she wants. However, on July 23, 2024, they reported that A.O. had been doing well and was sleeping better.

On October 16, 2024, the juvenile court terminated reunification services for father but continued them for mother.

As of January 2025, A.O. was making slow progress in meeting milestones but was comfortable in the caregivers' home and had a strong bond with D.S. The juvenile court terminated mother's reunification services on January 22, 2025.

A.O. continued having some difficulty with sleeping, self-soothing, and tantrums into May 2025. A.O. was two years old, but scoring between eight and 14 months on various tests. She did not have any extensive medical needs, however.

Mother gave birth to another child in June 2025, who is the subject of another dependency proceeding.

In July 2025, an Interstate Compact on the Placement of Children (ICPC) was approved for A.O. to go with D.S. to live with his paternal relatives in Michigan.

On August 6, 2025, A.O. was placed in the ICPC-approved home in Michigan with D.S.'s relatives, who were "willing and able" to provide permanency for both siblings.

As of September 16, 2025, the caregivers reported that A.O. was "doing well and appear[ed] to be adjusting as she has been able to establish a routine." She was "beginning to bond with caregivers and [their] son as the children are close in age and enjoy playing together." The caregivers were not having "any issues with [A.O.'s] behavior or excessive tantrums at this time." They enrolled her in "an early head start" program shortly after she arrived in Michigan. The Department recommended that the juvenile court terminate parental rights and release A.O. for adoption.

The juvenile court convened the permanency planning hearing on September 16, 2025. Mother requested a continuance for the adoption assessment to be completed, which the court denied. Father testified, and the court admitted the

Department's reports and took judicial notice of the record in D.S.'s dependency case. It then found "by clear and convincing evidence that [A.O.] is adoptable" and "no exception to adoption" applied, and terminated mother's and father's parental rights over A.O.

## DISCUSSION

### 1. Applicable law

"After reunification services have terminated, the focus of a dependency proceeding shifts from family preservation to promoting the best interest of the child including the child's interest in a 'placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

At the permanency planning hearing, "the court shall terminate parental rights and order the child placed for adoption" if it finds "by a clear and convincing standard . . . that it is likely the child will be adopted." (§ 366.26, subd. (c)(1).) The likely to be adopted standard is "a low threshold." (*In re J.W.* (2018) 26 Cal.App.5th 263, 267 (*J.W.*); *In re K.B.* (2009) 173 Cal.App.4th 1275, 1292 (*K.B.*).) "The court must merely determine that it is 'likely' that the child will be adopted within a reasonable time." (*K.B.*, at p. 1292.) We review that finding for substantial evidence, giving the juvenile court's determination "the benefit of every reasonable inference." (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562.)

### 2. Substantial evidence supports the adoptability finding

Both parents argue that the absence of the adoption assessment the Department was required to prepare (§§ 366.21, subd. (i), 366.22, subd. (c)) renders the record inadequate to sustain the juvenile court's finding that A.O. is adoptable. We

5

disagree. The Welfare and Institutions Code requires the Department to prepare an adoption assessment to address various subjects, "including the child's medical, developmental, scholastic, mental, and emotional status"; the "likelihood that the child will be adopted if parental rights are terminated"; " 'the eligibility and commitment of any identified prospective adoptive parent[s],' " including their ability to meet the child's needs; and " '[t]he relationship of the child to any identified prospective adoptive parent . . . , the duration and character of the relationship, [and] the motivation for seeking adoption or guardianship.' " (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 11–12 (*Valerie W.*), citing § 366.21, subd. (i)(1)(C)–(G).) Although the juvenile court had not received this formal report, its absence does not negate the substantial evidence in the record showing that A.O. was likely to be adopted within a reasonable time.

When there is a prospective adoptive home in which the child is already living, and the only indications are that the child will be adopted into that home, adoptability is established. (*J.W.*, *supra*, 26 Cal.App.5th at p. 268; *K.B.*, *supra*, 173 Cal.App.4th at p. 1293; see also *In re Helen W.* (2007) 150 Cal.App.4th 71, 80 (*Helen W.*) ["a prospective adoptive parent serves as evidence a child is likely to be adopted within a reasonable time either by the prospective adoptive parent or some other home"].) When a child is deemed adoptable because a particular caretaker is willing to adopt, the analysis shifts from the characteristics of the child to whether there is any legal impediment to the caretaker's adoption and whether they are able to meet the child's needs. (*Helen W.*, at p. 80; *In re Carl R.* (2005) 128 Cal.App.4th 1051, 1062.)

The record reveals no legal impediment to A.O.'s adoption and shows that the caretakers are willing and able to meet her needs. Mother and father both point to A.O.'s developmental delays and sleeping and behavioral problems to argue that insufficient evidence supports the adoptability finding. "Very few children in the dependency system are without problems," and to deny A.O. "the chance to permanently become a member of the family that loves [her], simply because [she] has special needs, would derail the entire concept of permanent planning." (*J.W.*, *supra*, 26 Cal.App.5th at pp. 268–269.) The record shows that A.O. adjusted well to her prospective adoptive parents, and that the latter "were excited to welcome [A.O.] into their home and . . . express[ing] a strong willingness and ability to provide permanency" for her. Such evidence distinguishes this case from *In re Brian P.* (2002) 99 Cal.App.4th 616, which mother cites, where not only was there no adoption assessment report, but there were also no prospective adoptive parents. (Cf. *J.W.*, *supra*, 26 Cal.App.5th at p. 265; *Helen W.*, *supra*, 150 Cal.App.4th at p. 80.)

Mother also points out that A.O. had not yet been tested and formally diagnosed with fetal alcohol spectrum disorder, which she urges might have impacted the caregivers' willingness to adopt. We are not persuaded. There is no requirement that a child's medical condition be certain before a court can find adoptability. (*Helen W.*, *supra*, 150 Cal.App.4th at p. 79.) The record shows that the caregivers were aware of A.O.'s developmental delays and problems and were willing to provide permanency for her nonetheless, in large part due to her bond with D.S., a relative whom they wanted to adopt.

Mother cites *Valerie W.* to argue that the lack of a formal diagnosis (or ruling out of) a serious medical condition precluded an adoptability finding in this case. The circumstances of *Valerie W.* were very different: In that case, the record was ambiguous as to whether the juvenile court was aware of the plan for a mother and daughter to "jointly adopt," and the question of whether there was a "legal impediment" to such an adoption remained unanswered. (*Valerie W.*, *supra*, 162 Cal.App.4th at p. 16.) There had also been no home study or basic assessment of one of the proposed joint adopters. (*Id.* at p. 15.) Nor was there any report of "the relationship between the children and each applicant[ and] the motivation of each . . . for seeking adoption and . . . for seeking a 'joint adoption.' " (*Id.* at pp. 13–14.) These significant deficiencies, *in addition to* "a lack of evidence concerning the child's condition, prognosis and treatment needs," rendered the evidence insufficient to sustain the juvenile court's adoptability finding. (*Id.* at p. 14.)

Mother also points to the fact that A.O. had only resided in the prospective adoptive home for "41 days" before the juvenile court found her adoptable. But mother does not cite any authority to show that this circumstance is dispositive.[2] Aside from the consistent statements and conduct of the caregivers showing their willingness and readiness to adopt A.O., several other factors support the juvenile court's finding that A.O. was likely to be adopted within a reasonable time. The caregivers desired to adopt D.S. (who is their relative), and recognized the

---

[2] Mother cites subdivision (n)(1) of section 366.26, but that provision concerns the designation of prospective adoptive parents, and this appeal concerns a finding of adoptability—i.e., the finding that A.O. will be adopted within a reasonable time.

bond he shared with his half sibling A.O. A.O. had been placed with her prior caregivers for "over 20 months" before she moved to the prospective adoptive home, which suggests that those motivated to care for her could do so on a long-term basis. A.O. had adjusted well to her new home in Michigan, had a "great appetite," was "sleeping well," and "enjoy[ed] playing" with the caregivers' other son. The caregivers also enrolled her in an early head start program shortly upon her arrival. As discussed by the Department, the prospective adoptive home was approved under the ICPC (see Fam. Code, § 7901 et seq.), meaning that the home and caregivers underwent an assessment to ensure A.O.'s safety. This undermines mother's assertion that the juvenile court "had no clue" as to whether the new Michigan caregivers had histories of crime or child abuse.

Substantial evidence in the record supports the juvenile court's finding that A.O. was likely to be adopted within a reasonable time.

## DISPOSITION

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED.

                                        LUI, P. J.

We concur:


        CHAVEZ, J.


        GILBERT, J.*

---

* Retired Presiding Justice of the Court of Appeal, Second Appellate District, Division Six, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.