Filed 11/19/24  In re E.D. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re E.D., a Person Coming Under the Juvenile Court Law. | |
| KERN COUNTY DEPARTMENT OF HUMAN SERVICES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> A.D. et al., <br><br> Defendants and Respondents. | F088168 <br><br> (Super. Ct. No. JD142047-00) <br><br><br> **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Susan M. Gill, Judge.

Margo A. Raison, County Counsel, and Ana M. Ovando, Deputy County Counsel, for Plaintiff and Appellant.

Marissa Coffey, under appointment by the Court of Appeal, for Defendant and Respondent A.D.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Respondent L.O.

-ooOoo-

---

[*]     Before Meehan, Acting P. J., Snauffer, J. and DeSantos, J.

Appellant Kern County Department of Human Services (department) appeals from the juvenile court's order at a Welfare and Institutions Code section 366.26[1] hearing where a permanent plan of another planned permanent living arrangement (APPLA) was ordered for the now six-year-old child, E.D. (the child), who is the subject of this dependency case. The department contends the juvenile court erred when it failed to find that the child was adoptable. We agree with the department's contention. Therefore, we reverse the juvenile court's order and remand for a new selection and implementation hearing consistent with section 366.26.

### FACTUAL AND PROCEDURAL BACKGROUND

*Initial Removal*

In May 2021, the department received a referral alleging general neglect against the child's mother, L.O. (mother). The referral alleged the child, at two years of age, had a knot on the top of his head, and mother and her boyfriend were heard engaging in domestic violence. A social worker responded to mother's home where the child and his three-year-old sister, A.D. (collectively, the children), were living. The floor of mother's home was covered with roaches, baby bottles, food, trash, and toys. The refrigerator had spoiled food and containers with dead roaches. The children were taken into protective custody by the social worker on May 14, 2021.

The social worker interviewed mother about the circumstances surrounding the children's removal on May 17, 2021. Mother denied that she had any domestic violence in her current or past relationships, and she also denied that her boyfriend was living in her home. Mother claimed that the child needed to be reevaluated for autism and dyslexia. She stated that he had been showing " 'signs' " of autism because he made random noises and would not make eye contact.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Regarding discipline in the home, mother explained that she had to sit with the child during timeouts. Mother also insisted that the scratches on the child's body were caused by the children " 'messing with a cat.' " She stated the children fought "all the time," and she attributed the bumps on the child's head to a fall. Mother indicated that she planned to follow up on the child's injuries during his next physical, but she had not scheduled an appointment with his physician. The social worker inquired about mother's use of physical discipline, and she denied using any form of physical punishment on the children.

On that same date, the children's care provider informed the social worker that she was concerned about multiple marks on the child's arms and legs. The care provider indicated that the child kept saying " 'mom crash me.' " The children had to be supervised and redirected throughout the day because they would fight with each other. The child showed the social worker a mark on his right thigh and said, " 'mommy push me.' " As the social worker photographed and measured the marks on him, the child repeated, " '[m]ommy crash me, mommy push me, and mommy scratch me.' "

The social worker documented several injuries to the child. There was a three-inch linear mark on the front of his right thigh, which appeared to be in the shape of a clothes hanger or folded cable. A two-inch mark on his left inner thigh was in the shape of an "S." The back of his right leg had two linear red marks at approximately two inches long from a belt or rectangular object. His right calf had linear and loop marks from one to two inches in length. There were also several linear scars on his arms at approximately one-half to one inch long, and a dark linear mark was noted on his left armpit. The child had several scratches on his face, a bruise on his left eyelid, and a laceration to his upper lip. The social worker did not observe any marks or bruises on the child's sister.

The department filed a petition alleging the child was described by section 300, subdivisions (a), (b)(1), and (e). The petition alleged the child was at substantial risk of

3.

suffering nonaccidental serious physical harm inflicted by mother. The petition detailed the injuries observed by the social worker along with the inadequate conditions in mother's home. The petition further alleged that the child had suffered severe physical abuse by mother. A petition was also filed for A.D., which alleged that she was described by section 300, subdivisions (a) and (b)(1). At a continued detention hearing held on May 21, 2021, the juvenile court ordered the children removed from mother's custody, and it set a combined jurisdiction and disposition hearing for June 25, 2021.

***Jurisdiction and Disposition***

The department's jurisdiction and disposition reports recommended that the allegations in the amended petition be found true and family reunification services be provided to mother and the child's father, A.D. (father). The children remained placed together in a resource family home. The child's sibling was found to be in need of mental health services, and she did not appear to be developing appropriately for her age.

The disposition report noted that the child appeared to be developmentally on target for his age, but he did not appear to be behaving in an age-appropriate manner. The results of a developmental screening for the child indicated that no further evaluations were necessary. The care provider was informed that any further assessments would require the parents' consent. A mental health screening conducted on June 11, 2021, found that the child was in need of further services for his emotional and mental health needs.

In June 2021, the children's care provider gave a 14-day notice for removal of the children because the children would go outside and scream. The care provider was concerned that her neighbors would call the police, but the department was able to resolve the issue to allow the children to remain in the same home. On July 13, 2021, the care provider explained that the children were fighting less often, and they were no longer hitting each other with objects. The children's mental health services were noted to be helping, but the children still had a difficult time following directions. The care

provider explained that she was not committed to adopting the children, but she would provide care while the parents attempted to reunify.

The juvenile court sustained the allegations under section 300, subdivision (b)(1) and dismissed the allegations under section 300, subdivisions (a) and (e) on August 26, 2021. At the continued disposition hearing held on December 6, 2021, the court ordered the children to remain in out-of-home care with family reunification services to be provided to mother and father. A six-month review hearing was set for June 6, 2022.

***Family Reunification Period***

In its report for the six-month review hearing, dated May 24, 2022, the department recommended that family reunification services be continued for mother and terminated for father. During the review period, the children's placements were disrupted on four occasions due to behavior issues and sibling fighting. The children were moved to different resource family homes on December 29, 2021, February 16, 2022, March 28, 2022, and May 13, 2022.

In February 2022, the child accused the new care provider of pinching him and pulling his hair when she picked up the children. The children were in the process of transferring to a local behavioral services provider at the time of the placement change. The care provider explained that the children needed constant redirection, and separation was the only way to stop the children's fighting. In March 2022, the social worker made an unsuccessful attempt to contact father about mental health services for the children.

The department filed a request to authorize a mental health assessment, treatment, and services for the child on March 17, 2022. The request was made after the child's father refused to authorize mental health treatment for the child. The social worker attempted to contact the attorneys for the child, mother, and father about the request, but none of the attorneys responded in the two weeks following her attempts. The request explained that the child, at three years of age, was exhibiting defiant behavior, constantly

fighting, and hitting his sister. The juvenile court granted the department's request on March 21, 2022.

In April 2022, the care provider stated that the child listened more than his sister, and she had to constantly tell his sister not to hit. The children were doing better at saying "sorry" to each other. The social worker asked the care provider about the child wearing "pull ups," and the care provider stated that the child was hesitant to use the toilet. It was explained that the child was out of diapers once he left his first placement. The care provider provided the social worker a 14-day notice after the child hit another child at day care, and he also threw a toy at her son's face, which led to the children's next placement.

There were no problems or concerns noted at the child's physical and dental examinations on February 2, 2022. The child was not receiving any mental health services or psychotropic medications, and it was determined that the child needed further services. The child's sister was attending weekly meetings with her therapist, and she was prescribed psychotropic medications.

At the six-month review hearing held on June 6, 2022, the juvenile court noted that a determination was made that the child did not need mental health services, and it requested that he be reevaluated for mental health treatment. The court acknowledged that the children lost placements due to their challenging behaviors. The court ordered continued family reunification services for mother, and father's family reunification services were terminated. A 12-month review hearing was set for July 12, 2022.

The report prepared for the 12-month review hearing recommended that mother's family reunification services be continued. The children remained in their same resource family home, and the care provider stated that they could consider adoption if the parents failed to reunify. The care provider indicated the child was being provided mental health services at their home. The children were becoming more attached and comfortable in the care provider's home after a few weeks in placement.

On July 7, 2022, mother explained that her visits were challenging because the child distanced himself and threw tantrums when things did not go his way. Mother requested that the child be "reassessed" due to his behaviors. She stated that the child's sister was doing "ok" while continuing her behavioral health services. At the 12-month review hearing, mother's family reunification services were continued, and an 18-month review hearing was set for November 10, 2022.

The department's report for the 18-month review hearing, dated October 31, 2022, recommended that mother's family reunification services be terminated. In September 2022, the child's "needs and services plan" indicated that he was receiving mental health services. He was continuing to struggle with exaggerated negative emotions when receiving correction for his defiant behaviors. He did not take any medications, and he functioned appropriately for his age. The report stated that the child was not receiving mental health services, but a referral for mental health services determined that he needed further services.

In October 2022, the children's care provider reported that the children were stable. However, they became hyperactive and did not get along on the way home from their supervised visits with mother. The social worker observed the child to be happy and in a good mood during her home visit. The child stated that he liked living with his care provider. An adoption review by a social services supervisor found the children to be appropriate for adoption and guardianship planning.

During the review period, mother tested positive for methamphetamine on two occasions, and she failed to appear for drug tests. She enrolled in substance abuse treatment, and her anticipated completion date was in February 2023. Mother missed approximately one-third of her supervised visits, which were scheduled for two times per week for two hours. She gave birth to the children's sibling, O.G., in August 2022.

The initial 18-month review hearing was continued to January 24, 2023, to coincide with the contested disposition hearing for O.G. A supplemental report, dated

January 20, 2023, recommended that the children be returned to mother's custody and family maintenance services be provided to mother. Mother completed her substance abuse counseling on December 20, 2022, and she provided negative drug test results from October 2022 through December 2022. At the 18-month review hearing, the juvenile court placed the children in mother's care, and family maintenance services were to be provided to mother.

**Supplemental Petition**

On February 6, 2023, the social worker completed an in-person contact at mother's residence. Mother informed the social worker that she found the child and sister alone in the bathroom together, and the child was about to touch his sister in the vaginal area with his hand. The child was asked about how he learned this behavior, and he reported that a boy at his foster home told him to touch his sister.

The social worker spoke to the child about the incident privately, and he stated that he was told to touch his sister inappropriately by a boy at his foster home. The child denied that he was being hurt or touched inappropriately. His sister later told the social worker that a boy in their foster home told the child to touch her in the private area. The sister affirmed that she felt comfortable living with her mother.

Another social worker completed an in-person contact with the children and mother on March 14, 2023. Two adult males were home at the time, and mother was running errands while the children watched a movie. The social worker spoke to the sister privately in her room, and she asked if she liked living with her mother. The sister responded, " 'Yes, but [the child] was doing nasty things to me so my mom makes him sleep in the living room now, but he still sneaks in my room.' "

When asked for further clarification, the sister shared that the child touches her private parts while she is asleep. The last time the child touched her private parts was the day prior. The sister did not tell mother about the latest incident because mother was sleeping, and she believed mother would be mad if she woke her. The social worker

8.

explained to the sister that it was important to tell mother when these things happen. The sister explained that she was spanked or locked in the bathroom with "Penny Wise" when she gets in trouble. She stated that "Penny Wise" lives in the toilet and eats people.

Next, the social worker interviewed the child privately in the sister's room. The child was asked if he liked living with mother, and he stated that he no longer lived with his former care provider because he was doing " 'nasty things.' " He indicated that he had to sleep in the living room because he was doing " 'nasty things' " to his sister while they shared the same bed. The child also shared that he goes in time out or with "Penny Wise" when he gets in trouble. The social worker informed the adult males that the home needed to be cleaned as she left the home.

On March 15, 2023, the department received a referral alleging that the child was sexually abusing his sister, but the referral was evaluated out without further explanation. The following day, a social worker met with mother to discuss her case plan and the referral that was evaluated out. Mother shared that the children received mental health services at a clinic, but she was unsure of their last appointment. The social worker encouraged mother to schedule an appointment with the children's therapist "ASAP."

Mother was informed about the sister's disclosure of inappropriate touching by the child at night time. The social worker advised that a safety plan needed to be implemented where either the child or sister slept with mother to prevent any future incidents. Mother became upset and yelled,

> " 'Your safety plan is stupid! This happened in the day time too! [The child] pees in the bed! It's not fair that I have to get peed on every night for something that you guys let happen! My kids were molested in that home and you guys didn't do anything about it! Now I'm being punished! When your stupid safety plan doesn't work and it keeps happening I hope you get fired!' "

The social worker attempted to explain the purpose of the safety plan to mother, but she left after mother continued to yell and scream at her. On March 20, 2023, the

9.

sister denied that the child had touched her since her initial disclosure on March 14, 2023. The sister initially claimed that she was sleeping in her own room while the child slept in the living room. However, she corrected herself to state that she was sleeping in her mother's room while the child slept in her room.

During a home visit on March 30, 2023, the social worker observed a twin size mattress and cereal on the living room floor. Mother stated that the children last met with their therapist approximately two months earlier. The children's therapist had been attempting to meet with mother and the children, but mother did not make herself available. Mother agreed to contact the children's therapist as soon as possible. The sister stated that she slept in her own room while the child slept in the living room. She continued to deny that the child was still attempting to touch her inappropriately. The child reported that he slept in the living room, and he denied that he was doing "nasty things" to his sister.

In May 2023, the child's mental health services were closed due to missed appointments, inconsistent attendance, and his mother not returning phone calls from the mental health staff. The child had not attended a mental health appointment since February 9, 2023. On June 13, 2023, the social worker observed mother's home to be unsanitary, and the children lacked proper beds and bedding. The child had several scratches and a bruise, and the sister admitted to scratching him. Mother and the child would not explain how he received the bruise. The conditions of the home were not improved during a home visit on the following day.

On June 15, 2023, the department placed the children and their younger sibling, O.G., into protective custody due to the conditions of the home. A supplemental petition pursuant to section 387 was filed alleging the previous disposition was ineffective in the protection of the child. The petition alleged that the home was found to pose a health and safety hazard. At the detention hearing held on June 26, 2023, the juvenile court ordered

the children and O.G. detained from mother's custody, and a combined jurisdiction and disposition hearing was set for July 24, 2023.

The department's jurisdiction report recommended that the allegations in the supplemental petition be found true, and the disposition report recommended that no additional family reunification services be provided to mother. The child and O.G. were placed together in a resource family home, and the sister was placed in a different resource family home. The report stated that the child was receiving mental health services without any additional details, and it also indicated that he appeared to be developmentally on target for his age. However, notes in the child's health and education passport stated that he had learning delays and special needs, and his care provider reported signs of autism.

The department also recommended that the court not set a section 366.26 hearing for the sister, at six years old, because it did not believe that she was a proper subject for adoption or guardianship. An adoption review was completed on July 12, 2023, which determined that the child, at five years old, and O.G., at 11 months old, appeared appropriate for adoption and guardianship planning. The report noted that a preadoptive placement needed to be located for the child and his siblings "right away."

On August 18, 2023, the juvenile court sustained the allegations in the section 387 petition, ordered the children removed from mother's custody, and denied additional family reunification services for mother. The court found that there was clear and convincing evidence that the sister was not a proper subject for adoption and no one was willing to accept legal guardianship, and she was ordered to be placed in foster care with a permanent plan of placement with a fit and willing relative. A section 366.26 hearing was set for the child and O.G. on December 12, 2023.

**Selection and Implementation Hearing**

The department filed another request for an order authorizing a mental health assessment, treatment, and services for the child on October 30, 2023. A declaration

11.

attached to the request stated that the child was in need of mental health counseling because he hit other children and suffered with enuresis. The juvenile court granted the order to authorize mental health treatment for the child on the date it was filed.

The initial section 366.26 report, dated December 1, 2023, recommended that the child be placed in foster care with a permanent plan of placement with a fit and willing relative. The child, at five years of age, was placed in a resource family home where the care provider desired to adopt him. Since his second removal from mother in June 2023, his placement was changed on two occasions. On June 22, 2023, the child and O.G. were moved to a different resource family home because he had hit O.G. and presented "concerning behaviors." The child was subsequently moved from the resource family home that he was sharing with O.G. on September 26, 2023. A separate placement was located for the child, and he remained in that resource family home as of the date of the report.

A physical examination was completed of the child on November 2, 2023, and there were no significant medical concerns noted. A developmental evaluation was also completed by a physician, and the child demonstrated age-appropriate development in the areas of personal, social, fine motor, language, and gross motor skills. The child began receiving wraparound services from the department on a weekly basis on May 31, 2023. He also met with a youth partner each week to work on anxiety, disruptive behavior, self-awareness, self-esteem, and physical and verbal aggression. The child's care provider also participated in bi-weekly meetings.

The child was participating in both individual and collaborative group therapy once per week. He was currently working on disruptive and self-injurious behavior, lying, disobeying rules, frustration, aggression, excessive energy, inattentiveness, impulsivity, social skills, and emotional behavior. The wraparound social worker and care provider noted that the child was doing well in his conduct as of November 7, 2023. He was enrolled in school where his academic performance indicated that he was

12.

developing in the areas of reading and writing. The child was also making satisfactory progress in the areas of following school rules, speaking and listening, and physical development. Areas in need of further growth were noted as listening without interrupting, age-appropriate attention span, and playing well with others.

The report noted that mother participated in approximately 21 of her 40 opportunities to visit with the child since June 21, 2023. Visitation notes indicated that mother engaged appropriately with the child, and no concerns were noted before or after visits. According to the child's care provider, the child did not ask about mother or visitation when he was at home. The child was able to transition after visits without issue. The social worker opined that the relationship between mother and the child had diminished into a visiting relationship, and she believed the parent-child relationship between them was minimal.

On November 7, 2023, the social worker spoke to the child about his feelings regarding his current care provider becoming his long-term foster parent. The different permanent plan options were explained to the child, but he did not appear to understand their differences. He reported that he liked living with the care provider, and he wanted to remain with his care provider. When asked to rate how certain he was about wanting to stay with the care provider on a scale of one to 10, he responded " '50.' " The care provider indicated that the child referred to her as " 'mom.' " The child also informed his wraparound social worker that he wanted to stay in his current placement if he could not be returned to his mother.

The department's assessment determined that termination of parental rights would not be detrimental to the child. However, its initial report did not recommend termination of parental rights because the child had only been placed with the new care provider for a short time. The social worker stated that the child was not generally adoptable based on his age and participation in mental health services. The department did recommend that parental rights be terminated and a plan of adoption be ordered for O.G.

13.

The section 366.26 hearing was continued to April 5, 2024, for the department to comply with ICWA. A supplemental report, dated April 4, 2024, provided an update on the child's status. On February 6, 2024, the social worker completed a home visit to the care provider's home. The child's teacher informed the care provider that the child had a bad day in the classroom because he was being disruptive. The child had to be calmed down by the care provider over the phone while he was in class. The care provider noted that the child was doing well in the home without any disruptive behavior. He recently graduated from the wraparound program in January 2024. The care provider disciplined the child by having his television time taken away or limited in options.

The social worker interviewed the child in private, and he reported that he wanted to take his belongings and live in a different home. He stated that he wanted to live with either his siblings, in a former resource family home, or in another home. He claimed that his current care provider and "everyone" were mean. The child stated that he was slapped on the face and hands "every day," but he also reported that he was last hit one week prior.

The child indicated that he was not allowed to eat snacks or breakfast when he was in trouble. The social worker was unable to observe any bruises or scratches on the child, and she encouraged him to follow rules at school and home. At the conclusion of the home visit, the care provider reported that she wanted to adopt the child because her adoptive son had learned to care for him and they played well together.

On March 7, 2024, another social worker completed a home visit at the child's placement. The care provider and the child were returning home after mother's scheduled visit was cancelled. The care provider's adoptive son and the child were rushed into the home by the care provider in a "very stern and directive manner." Both of the boys were asked if they needed to use the restroom, and only the adoptive son responded in the affirmative. The care provider explained that the child will sometimes wet himself if he is not reminded.

14.

The social worker went upstairs to see the bedroom that the child shared with the adoptive son. The child told the social worker that he was doing "good." The adoptive son came into the bedroom, and he attempted to grab the television remote while the child was showing the social worker what he likes to watch on television. The care provider yelled for the adoptive son to leave the room, and she had to pull him out of the room by his arm.

Once they were speaking privately again, the social worker asked the child if he liked living in the home. He responded in the negative, and he claimed she was "mean" towards him when he had difficulty sleeping because of his fear of the dark. The child indicated that he would not want to live in the home forever because the care provider was "mean." The social worker attempted to clarify how the care provider was "mean," and he eventually stated that she did not let him play with his toys or watch television. The child affirmed that he felt safe in the home, and he explained that he was not able to watch television when he gets in trouble. The social worker noticed that the child was moving around in place, and he prompted the child to use the restroom.

The care provider told the social worker that the child did not have any issues in the home, but he was described as "very hyper." The school contacted the care provider almost daily because the child was either disrupting class or wetting himself. The care provider explained that she disciplined the child by depriving him of his toys or television. The social worker asked if the care provider was committed to adoption, and she responded in the affirmative. The supplemental report continued to recommend that the child remain placed in foster care with a permanent plan of placement with a fit and willing relative.

On April 5, 2024, the section 366.26 hearing was continued at the department's request due to a pending ICWA inquiry. The department submitted a second supplemental report, dated May 17, 2024, which recommended that the parental

15.

rights of mother and father be terminated and a plan of adoption be selected for the child. The child remained placed in the same resource family home.

The emotional and mental health needs section of the report did not indicate that the child was receiving mental health services since graduating from wraparound services. However, he continued to display disruptive behavior in class. Mother agreed to allow the child to repeat Kindergarten as recommended by his school due to a low academic performance and maturity level. Two interventionists were present in the child's classroom for two hours per day to assist, elevate, and redirect the child's disruptive and physical behaviors.

On May 6, 2024, the social worker interviewed the child about his feelings on the care provider becoming his adoptive parent. The child did not appear to understand the differences between the different permanent plan options due to his age. The child reported that he liked his current placement, and he wanted to remain with his current care provider. The social worker observed the care provider refer to the child as " 'my baby.' "

The social worker's adoption assessment described the child as a "five-year-old, sweet, outgoing and happy male." The report opined that the child was "specifically adoptable" due to his age, behavioral concerns in school, and history of placement changes. The child had been in his current placement for almost eight months, and the care provider expressed her commitment to adoption. The report noted that it would be "somewhat difficult but not impossible to secure another pre-adoptive home for him." It concluded that the child would benefit from the permanency and stability of adoption, and a permanent plan of adoption was recommended for the child.

The assessment of the child's current care provider as a prospective adoptive parent described her as a 57-year-old female, who lives with two children under legal guardianship (14-year-old boy and 15-year-old boy), three adoptive children (five-year-old boy, 14-year-old girl, and 15-year-old girl), and one additional foster child

(15-year-old girl). The care provider's home was a certified foster family agency approved home in Kern County.

She lived in her current home since 2021, and the home had five bedrooms and three bathrooms. One bedroom belonged to the child and five-year-old adoptive son. Her criminal background check included no history that had not already been exempted. She also had no substantiated child welfare history. The care provider indicated that she did not have any major health issues that would prevent her from caring for the child.

The care provider was motivated to adopt the child in order to expand her family. She loved the child, and she saw him as part of her family. Her desire was to provide stability for the child, and she had fully integrated him into her family. The interaction between the child and the care provider was observed to be positive. She acknowledged her understanding of the legal and financial responsibilities of adoption, and she was committed to a plan of adoption. The care provider was willing to assume responsibility for the child into adulthood.

On May 21, 2024, the juvenile court held a contested section 366.26 hearing. Mother, father, and the care provider were present for the hearing. Counsel for the department informed the parties that it was submitting on its reports, and she was prepared to call the adoption social worker to testify. The juvenile court responded that it had "some concerns" about the child. Mother's counsel intended to make an offer of proof from mother and brief argument.

The adoption social worker testified on behalf of the department. She testified that the resource family approval department went out to the care provider's home in April to mitigate any of the child's concerns that the care provider was being "mean" to him. The social worker and her supervisor also went out to the home in May to address any potential concerns. The department determined that the child was referring to the care provider as "mean" because she was enforcing consequences in response to his behavior

17.

at school. The decision was made by the social worker and her supervisor to leave the child in the care provider's home after completing their investigation.

The juvenile court began to conduct its own cross-examination of the social worker based upon the child's prior statement that he wanted to leave the care provider's home. The social worker confirmed the timeline of events that were detailed in the department's reports concerning her interactions with the child and his care provider. The juvenile court asked the social worker if she was concerned about the child previously reporting that he did not want to be in the care provider's home, and she responded, "We went to the home and discussed and he mentioned no concerns." The juvenile court then went on to ask,

> "Okay. So you got a little guy who's in a home and he's telling people, I don't like being here, the caregiver is mean to me, and nobody does anything about it. Don't you think maybe he finally, eventually says, "Okay, fine, I'm fine"? I'm asking for your opinion, because I have concerns here. It doesn't sound like anybody is listening to [the child], and it doesn't sound like [the child] knows anybody is listening to him. And the caregiver might be the greatest person on earth, but we've got a kid who's got some concerns and nobody's telling him, I'm hearing you, I'm listening to you. Do you understand why I am concerned?"

The social worker responded in the affirmative, and the juvenile court proceeded to ask if she could provide anything to alleviate its concerns. The social worker responded as follows:

> "We went out to the home in May. He said there's no concerns. His concerns are just in school, not in the home. He is a child that's very happy, very outgoing. He's playful. He's jumping all around, and there's always discipline for everything, but it's appropriate discipline.

> "We have reminded the caregiver. She insisted to adopt him. She wants to adopt him. And he seems to be fine in the home."

After testimony was provided by mother and father regarding their visitation with the child, the hearing proceeded with closing arguments from counsel. Mother's counsel argued that the department's position that the child was "specifically adoptable" allowed

the parties to "look into the adoptive home." Her counsel asserted that the child was not "specifically adoptable by this particular family. And while he may be able to remain there, it should be in some other capacity, such as long-term foster care and, obviously, his situation could be reassessed in a future date. But I think the facts support a finding as I'm suggesting to the Court concerning his adoptability."

The child's counsel initially requested that the court find an exception to adoption applies, and he proceeded to state the following:

> "My request would be long-term foster care based on just the length of time that the foster placement has been in place. I think the Department has examined the home and has looked into things because the caretaker has had—she has other children in her care and has adopted other children. I don't really have specific concerns with her, but because it is—there have been these recent issues and concerns expressed by [the child], I just think it would be better to have eyes on and be able to monitor that situation until we know more in the future. So that's my position today."

The department's counsel argued that there was clear and convincing evidence that the child was likely to be adopted based upon the current care provider's commitment to adopt him despite his behaviors.

After hearing argument from all counsel, the juvenile court proceeded to its ruling on the section 366.26 hearing. The court began with its determination on the beneficial parent-child relationship exception to adoption, and it did not find that mother met her burden to prove the exception. Next, the court turned to the issue of adoptability by reasoning as follows:

> "The question I have is whether—I mean I don't think there's any question that [the child] is just specifically adoptable. The question in my mind is whether this is—whether it's in his best interests to terminate parental rights and put him on the road to adoption in this home.
>
> "This may be the perfect home for him. It may be that whatever his issues were previously were such that he's overcome them or they've overcome them, but I cannot, given the state of the evidence, say I'm going to terminate parental rights forever and say that he's going to be adopted by

19.

this family when I don't have confidence that that is really where he feels safe and loved.

"So I'm not saying he needs to be removed, but I am saying that when he expresses concern, he needs to understand that those concerns are being heard and he needs to understand that we don't want him to be in a place where he doesn't feel safe. We don't want him to be in a place where he feels that he's not loved and nurtured.

"Now the most recent evidence is that he is feeling loved in this place, but what I don't know is whether he's just given up saying, I'm not comfortable here, or whether something has changed there. And I don't have evidence to satisfy that, so I can't terminate parental rights for [the child], at this point."

The juvenile court concluded its ruling by explaining that it wanted the child to have permanency and stability, but it did not want the child to be in a home forever that he had concerns about. After its ruling, the department's counsel asked for clarification as to the exception that the court was applying. The court then stated, "I find that [the child] is not generally adoptable and that there is not clear and convincing evidence that he would be adopted at this time. There is not clear and convincing evidence he would be adopted by this family."

In making its findings, the juvenile court noted that it was not requesting for the child to be moved from the care provider's home, but it wanted the department to give more attention to the statements the child makes in his placement. The court went on to find that the child's current placement was necessary and appropriate. The court found that there was not clear and convincing evidence that the child was likely to be adopted, and ordered APPLA as the permanent plan for the child. The department filed a timely notice of appeal on June 6, 2024.

**DISCUSSION**

The department challenges the sufficiency of the evidence to support the juvenile court's finding that the child was not adoptable. The department contends the record supports a finding that the child was likely to be adopted, there were no legal

20.

impediments to adoption, and the court erred when it considered the child's best interest outside of the context of the exceptions to adoption.

## A.   *Legal Principles*

Once the juvenile court sets a hearing pursuant to section 366.26 to select and implement a permanent plan for a dependent child, the department must prepare an assessment, frequently referred to as an adoption assessment.  "Such an adoption assessment provides the information necessary for the juvenile court to determine whether it is likely the child will be adopted [citation] and to consequently order termination of parental rights."  (*In re G.M.* (2010) 181 Cal.App.4th 552, 559.)  The assessment must include "[a] preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent …."  (§ 366.21, subd. (i)(1)(D).)  "A child's current caretaker may be designated as a prospective adoptive parent if the child has lived with the caretaker for at least six months, the caretaker currently expresses a commitment to adopt the child, and the caretaker has taken at least one step to facilitate the adoption process.  (§ 366.26, subd. (n)(1).)"  (*G.M.*, at p. 559.)

At the section 366.26 hearing, the juvenile court must determine by clear and convincing evidence whether it is likely the minor will be adopted.  (§ 366.26, subd. (c)(1).)  If the court finds a likelihood of adoption, the court must terminate parental rights absent evidence termination would be detrimental to the minor under one of the exceptions to adoption (§ 366.26, subd. (c)(1)(B)(i)–(vi)) that are not applicable here.  (See *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

In determining adoptability, the juvenile court assesses the child's age, physical condition and emotional state and how these characteristics affect a prospective parent's willingness to adopt the child.  (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).)  To be considered adoptable, the child need not be in a prospective adoptive home and there need not be a prospective adoptive parent waiting to adopt.  The fact a prospective adoptive parent has expressed interest in adopting the child is evidence the

child's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade adoption of the minor. A prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family. (*In re R.C.* (2008) 169 Cal.App.4th 486, 491 (*R.C.*).)

The " 'likely to be adopted' standard is a low threshold." (*In re J.W.* (2018) 26 Cal.App.5th 263, 267.) "[A] child may only be found to be difficult to place for adoption if there is no identified or available prospective adoptive parent for the child because of the child's membership in a sibling group, or the presence of a diagnosed medical, physical, or mental handicap, or the child is seven years of age or older." (§ 366.26, subd. (c)(3).)

In assessing adoptability, some courts have divided children into two categories: those who are "generally adoptable" and those who are "specifically adoptable." A child is "generally adoptable" if the child's traits, e.g., age, physical condition, mental state and other relevant factors do not make it difficult to find an adoptive parent. A child is "specifically adoptable" if the child is adoptable only because of a specific caregiver's willingness to adopt. (*R.C.*, *supra*, 169 Cal.App.4th at pp. 492–494.) " 'When a child is deemed adoptable *only* because a particular caretaker is willing to adopt, the analysis shifts from evaluating the characteristics of the child to whether there is any legal impediment to the prospective adoptive parent's adoption and whether he or she is able to meet the needs of the child.' " (*Id*. at p. 494.) For example, a married person, not lawfully separated, may not adopt a child without the consent of the spouse. (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650, citing Fam. Code, § 8603.)

### B. Standard of Review

Where, as here, the juvenile court concluded that the party with the burden of proof did not carry the burden, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.]

Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

### C. Analysis

"At the selection and implementation hearing under section 366.26, the trial court determines whether the child is adoptable on the basis of clear and convincing evidence." (*In re Josue G.* (2003) 106 Cal.App.4th 725, 732.) "A prospective 'family's suitability to adopt is irrelevant to the issue whether the minor[] [is] likely to be adopted,' which is the *only* issue at the selection and implementation hearing. [Citation.] 'The sole issue at the selection and implementation hearing is whether there is clear and convincing evidence that the child is adoptable. [Citations.] In resolving this issue, the court focuses on *the child*—whether his age, physical condition and emotional state make it difficult to find a person willing to adopt him. [Citation.]' " (*Id.* at p. 733.)

"Where the social worker opines that the minor is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any legal impediment to adoption by that parent …." (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) However, " '[g]eneral suitability to adopt is a subjective matter which does not constitute a legal impediment to adoption. If inquiry into the suitability of prospective adoptive parents were permitted in section 366.26 hearings, we envision that many hearings would degenerate into subjective attacks on all prospective adoptive families in efforts to avoid termination of parental rights. Such a result is not envisioned by the statutory scheme.' " (*Ibid.*, fn. omitted.)

" '[T]he question of a family's suitability to adopt is an issue which is reserved for the subsequent adoption proceeding.' " (*R.C.*, *supra*, 169 Cal.App.4th at p. 494, citing *In re Scott M.* (1993) 13 Cal.App.4th 839, 844; *In re Marina S.* (2005) 132 Cal.App.4th 158,

23.

166 ["[T]here is no requirement that an adoptive home study be completed before a court can terminate parental rights."].)  The question before the juvenile court is whether the child is likely to be adopted within a reasonable time, not whether any particular adoptive parents are suitable.

The department contends that the juvenile court based its refusal to terminate parental rights on a best interest determination without consideration of any legal impediments or statutory exceptions to adoption.  Mother asserts that the department's evidence was contradicted and there was room for the juvenile court to make its determination that adoption is not in the child's best interest under section 366.26, subdivision (h)(1), as there are concerns that adoption by the care provider was not in the child's best interest.  Father joins in the arguments set forth in mother's brief.

To the extent that the juvenile court found that the child was not adoptable because it did not have confidence that the child felt safe and loved in the care provider's home, such concerns were not relevant to the child's adoptability.[2]  The record demonstrated that the care provider was certified as a resource parent, and she had previously adopted other children who were still living in the home.  The department had already completed its investigation into the child's previous complaints, and it determined that he made the allegations because he was upset about the care provider's provision of consequences for his disruptive behavior at school.  At the time of the hearing, the child had reaffirmed his desire to remain in the home, and he reported that he felt safe in the care provider's home.

---

[2]     The juvenile court's potential concerns could have been alleviated by continuing the hearing for further investigation by the child's court appointed counsel.  (See section 317, subd. (e)(2) ["If the child is four years of age or older, counsel shall interview the child to determine the child's wishes and to assess the child's well-being, and shall advise the court of the child's wishes.…"].)

24.

The care provider understood the responsibilities of adopting, and she was committed to provide for the child until he reached adulthood. Because the juvenile court's determination was not directed to any legal impediments which would preclude the care provider from adopting the child, it erred when it refused to terminate parental rights. In fact, the juvenile court stated at the outset of its ruling that, "I don't think there's any question that [the child] is just specifically adoptable." Such a statement makes it clear that the court believed that the care provider was able and willing to adopt the child. Accordingly, the record was uncontradicted that there were no legal impediments to the care provider's ability to adopt the child.

Next, mother claims that the juvenile court's finding was supported because the child had a history of concerning behaviors and mental health needs. While such concerns may raise issues as to the child's general adoptability, they would not prevent the child from being considered specifically adoptable by his current care provider or another prospective adoptive parent. " ' "[I]t is only common sense that when there is a prospective adoptive home in which the child is already living, and the only indications are that, if matters continue, the child will be adopted into that home, adoptability is established.…" ' " (*In re J.W.*, *supra*, 26 Cal.App.5th at p. 268.) "Very few children in the dependency system are without problems. To deny [the child] the chance to permanently become a member of the family that loves him and that he loves, simply because he has special needs, would derail the entire concept of permanent planning. The evidence shows that the placement is working and that [the child] is adoptable." (*Id.* at pp. 268–269.)

In assessing the adoptability of a high-needs child, "the assessment of the adoptability of [the] child must necessarily include some consideration of whether the prospective adoptive parents can meet that child's needs, since if the prospective adoptive parents cannot meet the child's needs, the child cannot properly be found to be adoptable." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1062 (*Carl R.*).) However, the

juvenile court's focus was not on the ability of the care provider to meet the child's needs, but it based its decision on the subjective statements of a five-year-old child. The care provider had demonstrated a competent and commendable ability to address the needs of a child who had experienced multiple placement disruptions and removals from his mother. Accordingly, there was no room for a judicial determination that there was insufficient evidence to support a finding that the child was likely to be adopted.

Finally, mother asserts that the juvenile court's finding should be upheld because it was not in the child's best interest to be adopted by his current care provider. At all proceedings under section 366.26, "the court shall consider the wishes of the child and shall act in the best interests of the child." (§ 366.26, subd. (h)(1).) However, unless the child is age 12 or over and objects to the termination of parental rights, this does not mean that the court must follow the child's wishes, because what a child wants is not necessarily determinative of his or her best interest. (§ 366.26, subds. (c)(1)(B)(ii), (h); *In re Joshua G.* (2005) 129 Cal.App.4th 189, 201.)

Furthermore, the juvenile court must consider the best interest of the child only in the context of whether one of the exceptions in section 366.26, subdivision (c)(1)(A) and (B) applies. (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1165.) "The purpose of the specified exceptions is to ensure that termination of parental rights is in the child's best interests and is the least detrimental alternative." (*Carl R.*, *supra*, 128 Cal.App.4th at p. 1070.) A child's "feelings about adoption are necessarily considered when determining whether the parent-child relationship exception to termination of parental rights applies …." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 472, fn. 4.)

Where no exception is applicable, as in the present case, it is in the child's best interest to terminate parental rights. (*Carl R.*, *supra*, 128 Cal.App.4th at p. 1070.) Accordingly, the juvenile court was not permitted to consider whether the child's best interest would be served by selecting an alternative permanent plan. "The Legislature has determined what is in a child's best interests by implementing the procedures,

presumptions, and time lines in the dependency scheme. [Citations.] The Legislature has provided five exceptions to terminating parental rights, and a general exception for the best interests of the child is not among them. Whether such an exception should exist is a question for the Legislature, not this court." (*Ibid*.)

In sum, the juvenile court erred when it determined that the question to be resolved was "whether it's in [the child's] best interests to terminate parental rights" after it already found that the parent-child relationship exception to adoption was inapplicable. There is simply no general "best interest" exception to the termination of parental rights and the legislative preference for adoption. (*In re Jamie R.* (2001) 90 Cal.App.4th 766, 774.) Accordingly, the court erred when it failed to find that the child was likely to be adopted and ordered a plan other than adoption.[3]

Although we could decide the issue of the child's adoptability on the record developed at the time of the hearing, we decline to do so. For this court to determine the child's adoptability as it existed six months ago without any consideration of the child's continued progress in the care provider's home in the interim would serve no one. We therefore remand the matter to the juvenile court for a determination on the child's adoptability in light of the authority set forth in this decision.

## DISPOSITION

The order determining APPLA to be the appropriate permanent plan is reversed. The juvenile court is directed to conduct a new section 366.26 hearing consistent with the authority presented in this opinion. The parties may introduce such additional relevant evidence as they deem necessary, including but not limited to, evidence of the child's current circumstances and any developments that might have occurred during the pendency of this appeal.

---

[3] We also note that the juvenile court improperly selected a permanent plan of APPLA for the five-year-old child, which is not authorized for children under the age of 16. (See section 366.26, subd. (c)(4)(B)(ii).)

27.